# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. _____

WILLIAM MCLEOD, Individually and on behalf of
all others similarly situated,

       Plaintiff,                                   **CLASS ACTION**

v.

                                              **JURY TRIAL DEMANDED**

MONAKER GROUP, INC., formally known as
NEXT 1 INTERACTIVE, INC., WILLIAM KERBY,
DON MONACO, and D'ARELLI PRUZANSKY, P.A.

       Defendants.
_____/

## CLASS ACTION COMPLAINT FOR VIOLATIONS
## OF THE FEDERAL SECURITIES LAWS

COMES NOW, Plaintiff, WILLIAM MCLEOD ("Plaintiff"), through his undersigned attorneys, alleges upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the public documents and announcements issued by MONAKER GROUP, INC. f/k/a NEXT 1 INTERACTIVE, INC ("Monaker"), filings with the Securities and Exchange Commission ("SEC"), press releases published by and regarding Monaker, public sworn testimony on the part of Monaker's officers and directors, and other information readily obtainable on the Internet.

## NATURE OF THE ACTION

1. This is a federal class action brought individually and on behalf of all other persons and entities who purchased or otherwise acquired Monaker stock from April 6, 2012 through June 23, 2016, (the "Class Period"), seeking to recover damages pursuant to § 10(b) and §

20(a) of the Securities Exchange Act of 1934 (the "Exchange Act), and Rule 10b-5 promulgated thereunder (the "Class"), and damages pursuant to Negligent Misrepresentations made by D'Arelli Pruzansky, PA, Monaker's independent auditor, in audits that were publicly filed with Monaker's SEC filings.

2. This is a case about Monaker's publicly-filed and independently-audited financial statements being now exposed as having been materially misleading to Monaker's investors during the Class Period.  Until June 23, 2016, the Class did not learn, nor could it have reasonably learned, that it had been materially misled through Monaker's financial statements, SEC filings, Sarbanes-Oxley Certifications, and press releases; on June 23, however, Monaker filed a 10-K notifying the public that it would be forced to restate its financials from the Class Period, and that Monaker had paid up to $11.1M of Monaker's funds—without any consideration in return—to support the operations of an entirely separate public company that was previously controlled by Defendants William Kerby, Don Monaco ("the D&O Defendants") and Mr. Adam Friedman. The name of the separate company that the D&O Defendants and Mr. Friedman controlled and financially supported using Monaker funds is RealBiz Media Group, Inc. ("RealBiz"). It was not until the D&O Defendants were disaffiliated with RealBiz, and replaced as board members, that the D&O Defendants admitted to the Monaker investors that Monaker funds had been used throughout the Class Period to support RealBiz's operations—transfers to RealBiz that the D&O Defendants had also failed to disclose in any SEC filings, audited financial statement, or other financial disclosure.

3. The Class members all invested with Monaker without knowing that Monaker was secretly transferring funds to RealBiz in a manner that led to a material misstatement on

Monaker's financial statements requiring a restatement of all its prior financial statements. By secretly supporting RealBiz's financial stability, Monaker was depriving Monaker's investors of the cash flow necessary for Monaker to succeed and grow into a profitable business. Monaker investor losses during the Class Period total around $20,000,000.

4.  During the Class Period, and in connection with Monaker's fundraising efforts to solicit investors, the Defendants made untrue statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose material facts concerning Monaker's financial condition.

### JURISDICTION AND VENUE

5.  The claims alleged herein arise under § 10(b) and § 20(a) of the Exchange Act and the rules and regulations of the SEC promulgated thereunder.

6.  The Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act, 15 U.S.C. § § 77 and 78, § 22(a) of the Securities Act, and 28 U.S.C. § 1331.

7.  Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § § 77 and 78, and 28 U.S.C. § 1391(b), as a substantial part of the acts events or omissions giving rise to the claims pleaded herein occurred in this District and Defendants named herein maintain their residence or principal places of business in this District.

8.  At all times material hereto, Monaker has been headquartered at 2690 Weston Road, Suite 200, in Weston, Florida.

9.  Upon information and belief, Mr. Kerby is a resident of Broward County, Florida.

10. Upon information and belief, Mr. Monaco is a resident of the State of Minnesota.

11. The D'Arelli Pruzansky PA's primary place of business is located in Broward County, Florida.

12. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of a United States Stock Exchange.

## PARTIES

13. Plaintiff purchased shares of Monaker common stock, as set forth in the accompanying certification, which is incorporated by reference herein, and has been damaged thereby. Specifically, Plaintiff's stock lost approximately 90% of its value during the time period he invested with Monaker.

14. Monaker is a multi-faceted interactive media company whose key focus is around what Monaker believes to be the most universal, yet powerful consumer-passion categories: travel, home, and work.  Monaker is engaged in the business of providing digital media and marketing services for these industries, along with the opportunity to create long term relationships through its "Home & Away Club" membership programs.  Monaker generates revenue from commissions derived through traditional sales of its travel products.

15. On October 10, 2008, Monaker filed a Form S-1 with the SEC attempting to register its shares for an initial public offering ("IPO"). Shortly thereafter, Monaker started soliciting investor funds through various SEC filings, including 10-K and 10-Q filings depicting the financial stability and activity within the company. Monaker currently has approximately 800 separate investors.

16. Defendant William Kerby has served as the chairman and Chief Executive Officer of Monaker since 2008 until present.  Mr. Kerby signed under Section 302 and 906 Certifications of the Sarbanes-Oxley Act of 2002, 10-K's on June 13, 2013, June 13, 2014, June 16, 2015, and June 23, 2016, as well as Form 10-Q's on October 22, 2012, January 22, 2013, July 22, 2013, October 21, 2013, January 21, 2014, July 21, 2014, October 20, 2014, January 20, 2015, August 8, 2015, October 16, 2015, January 19, 2016, July 20, 2016, and October 18, 2016.

17. Defendant Don Monaco has served on Monaker's Board of Directors from 2011 until present. In 2015, Mr. Monaco was named Monaker's Chairman of the Board. Mr. Monaco has been instrumental in the management and financial decision making within Monaker. Mr. Monaker, according to Monaker's SEC filings, was selected to serve on Monaker's board because "he brings a strong business background to the Company, and adds significant strategic, business and financial experience. Mr. Monaco's business background provides him with a broad understanding of the issues facing (Monaker), the financial markets and the financing opportunities available to (Monaker)."

18. Upon information and belief, Monaker is named after Mr. **Mona**co and Mr. **Ker**by.

19. The D&O Defendants, because of their positions within Monaker, controlled and/or possessed the authority to control the contents of its reports, press releases, SEC filings, and presentations to securities analysis and—through them—to the investing public. By reason of their management positions, and their related ability to make public statements in the name of Monaker, the D&O Defendants were, and are, controlling persons, and had the power and influence to cause—and did cause—Monaker to engage in the conduct complained of herein.

20. Defendant D'Arelli Pruzansky, PA ("Auditor Defendant"), is a public accounting firm that served as the auditor for Monaker during the Class Period and allowed materially-misstated financial statements to go undetected during that period.   The Auditor Defendant's audit "Report(s) of Independent Registered Public Accounting Firm" were filed with material misstatements as part of Monaker's 10-K SEC filings during the Class Period, most notably the 10-K's filed on June 13, 2013, June 13, 2014 and June 16, 2015. In Monaker's 10-K filed on June 23, 2016, Monaker disclosed that it would be using a new auditor, LBB & Associates Ltd., LLP, to issue restatements with respect to Monaker's previous financial statements that were audited by the Auditor Defendant.

21. Monaker, the D&O Defendants, and the Auditor Defendant are referred to collectively herein as the "Defendants."

## CLASS ACTION ALLEGATIONS

22. Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23 (a) and (b)(3) on behalf of all those who purchased or otherwise acquired Monaker stock from April 6, 2012 through June 23, 2016. Excluded from the Class are Defendants herein, members of the immediate family of each of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

23. The members of the Class are located in geographically diverse areas and are so numerous that joinder of all members is impracticable.   It is estimated that there are approximately

800 members of this class, and their damages are estimated to be approximately $20,000,000.

24. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether Defendants violated federal securities laws based upon the facts alleged herein;

(b) Whether the SEC filings including certifications and information provided by Defendants misrepresented material facts about Monaker and its financial condition;

(c) Whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and financial condition of Monaker;

(d) Whether the D&O Defendants caused Monaker to issue false and misleading financial statements during the Class Period;

(e) Whether the Auditor Defendant negligently issued audit opinions that materially misstated the financial condition of Monaker to the investing public;

(f) Whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(g) Whether the prices of Monaker securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(h) Whether the members of the Class have sustained damages and, if so, the proper measure of damages.

25. Plaintiff's claims are typical of the claims of the members of the Class as Plaintiff, and members of the Class sustained damages arising out of Defendants' wrongful conduct in violation of federal laws as complained of herein.

26. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to, nor in conflict with, those of the Class.

27. A class action is superior to alternative methods for the fair and efficient adjudication of this controversy since joinder of all members of this Class is impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

28. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

    (a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

    (b) The omissions and misrepresentations were material;

    (c) Monaker securities are traded in an efficient market;

    (d) Monaker's shares were liquid and traded with moderate to heavy volume during the Class Period;

    (e) Monaker traded on a public stock exchange and was covered by multiple analysts;

    (f) The misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of Monaker's securities; and

(g) Plaintiff and members of the Class purchased, acquired and/or sold Monaker securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

29.     Based on the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## FACTUAL ALLEGATIONS

**a.  Monaker secretly transfers its money to a separate company through a conflict of interest involving the D&O Defendants.**

30.     Monaker was initially reporting as a Nevada shell company called Maximus Exploration Corporation.  On October 9, 2008, Maximus changed its name to Next 1 Interactive, Inc. ("Next 1") via a reverse merger. The purpose of the acquisition was so Next 1 would become a fully reporting company with the SEC and have its stock quoted on the Over-the Counter Bulletin Board.  Next 1's initial offering included 200,000,000 shares of common stock, and 100,000,000 shares of preferred stock. Next 1 Interactive subsequently changed its name to Monaker in or about 2014.

31. In 2012, the D&O Defendants worked to obtain ownership of an entirely separate privately-held company called Webdigs, Inc. ("Webdigs"). The D&O Defendants' goal was to use a shell public company called RealBiz Media Group, Inc. ("RealBiz") as a vehicle to publicly raise money for Webdigs' operations.  After acquiring Webdigs, the D&O Defendants merged Webdigs assets into RealBiz and started publicly raising money through RealBiz.  In 2012, Monaker was a majority shareholder in RealBiz. From 2012 through October 2014, Monaker's ownership interest in RealBiz continued to diminish until Monaker was no longer a majority shareholder in RealBiz.

32. In November 2012, after it was no longer a majority shareholder, Monaker began consolidating the financial statements of RealBiz into its own financial statements– something it was able do because, at the time, Monaker still had control over both companies operating and financial policies. *See Defendant Kerby's affidavit, marked as Exhibit A.*  Therefore, the D&O Defendants controlled both balance sheets of Monaker and RealBiz and were in complete control of accurate financial reporting for Monaker. *See Defendant Kerby's affidavit, marked as Exhibit A.* Instead of using this simultaneous control to the benefit of transparent and accurate financial reporting, the D&O Defendants used the opportunity to secretly use Monaker funds as a slush fund to support RealBiz when RealBiz's operations needed extra cash to survive.

33.  Importantly, despite Monaker's ownership interest in RealBiz, the two public companies remained two separate companies with two different sets of investors: Monaker investors were investing in a company that specialized in the travel industry; RealBiz investors were investing in a company that specialized in the internet-related real estate business and marketing of real estate properties similar to companies such as Trulia and Zillow.

34. The D&O Defendants ultimately allowed a conflict of interest to arise with respect to their roles on the boards of both Monaker and RealBiz.  Specifically, at all times material hereto up until mid-2015, Defendant Kerby served as the CEO of both Monaker and RealBiz, and Mr. Friedman served as the CFO of both Monaker and RealBiz.  Defendant Monaco served on the board for both Monaker and RealBiz.  The D&O Defendants dual roles fueled a conflict of interest and, unfortunately, allowed them to use Monaker funds as a de facto piggy bank to furtively support RealBiz operations when RealBiz was short on cash.

35. Monaker now admits in its June 2016 10-K that it allowed up to $11.1M of Monaker's funds to be transferred to RealBiz without disclosing the same to the investing public. Consequently, Monaker's public filings were materially misstated, and Monaker was deprived of its investors funds that were supposed to be used to support and grow Monaker's operations. Instead, the Class-invested funds were materially and secretly used to support the operations of another company, RealBiz, during the Class Period.

36. By November 2013, Monaker had lost more than 100% of its investment in RealBiz and had raised over $9M in investor funds that were mostly for the benefit of RealBiz. *See Defendant Kerby's affidavit, marked as Exhibit A.* Critically, the Defendants never disclosed to the investing public, including the Class, that by November 2013 almost $9M of Monaker's investor funds had been used to support this entirely separate company, RealBiz.

37. Monaker's stock price was continually depressed and manipulated because Monaker continued to lose money—ultimately totaling around $20M—during the Class Period. The D&O Defendants decision to secretly drain Monaker's financial reserves by up to $11.1M prohibited Monaker from using those same funds to support Monaker's research, development, marketing, and other operations that were required to increase Monaker's financials and help Monaker's stock price grow.

b. **Monaker's SEC filings utterly failed to disclose the extent of Monaker funds that were used to support the separate company, RealBiz.**

38. As the simultaneous CEOs and CFOs, for Monaker and RealBiz, Defendant Kerby and Mr. Friedman controlled the financial information, investor disclosures, press releases, and SEC filings for each company.

39. As clear evidence of intentional wrongdoing, the D&O Defendants reported to the investing public in their simultaneous roles as CEO, CFO, and Board Member for both Monaker and RealBiz, that Monaker owed RealBiz sums of money up to approximately $1.3M.  This material misrepresentation was made at a point in time when it was, in fact, Monaker that was owed up to $11.1M from RealBiz. Thus, there was an approximate $12.5M financial misreporting between the two companies that was orchestrated through the D&O Defendants, and publicly reported under Sarbanes-Oxley Certification to the Class.

40. In RealBiz's 10-Q filing with the SEC for the period ended April 30, 2014, RealBiz's "due from Monaker" was $4,199 as of October 31, 2013, and $1,081,960 as of April 30, 2014.  Monaker now admits that it was owed millions of dollars from RealBiz at the time Defendant Kerby and Mr. Friedman signed these RealBiz 10-Q filings under Sarbanes-Oxley Certifications. The D&O Defendants failed to alert the Class that the vast majority of their investment funds were being used to support an entirely separate company, RealBiz.

41. In RealBiz's 10-K filed with the SEC for the fiscal year ended October 31, 2014, RealBiz's "due from Monaker" was $131,086.  Monaker now admits that it was owed millions of dollars from RealBiz at the time Defendant Kerby and Mr. Friedman signed this RealBiz 10-K filing under Sarbanes-Oxley Certifications. The D&O Defendants once again failed to alert the Class that their investment funds were being used to support an entirely separate company, RealBiz.

42. RealBiz's 10-K filing with the SEC from February 13, 2015, included an independent audit opinion from the Auditor Defendant certifying the accuracy of the financial

statements within the 10-K, including the $131,086 that was shown as due at the time from Monaker to RealBiz. The D&O Defendants failed to alert the Class that their investment funds were being used to support an entirely separate company, RealBiz.

43. In RealBiz's 10-Q filing with the SEC for the quarterly period ended July 31, 2013, RealBiz's "due from Monaker" was $1,295,938 as of July 31, 2014. Monaker now admits that it was owed millions of dollars from RealBiz at the time Defendant Kerby and Mr. Friedman signed this RealBiz 10-Q filing under Sarbanes-Oxley Certifications. The D&O Defendants failed to alert the Class that their investment funds were being used to support an entirely separate company, RealBiz.

44. The Auditor Defendant verified that the amounts depicted in the aforementioned RealBiz 10-K filings were accurate by issuing a clean audit opinion for RealBiz showing Monaker owing RealBiz the aforementioned amounts on the RealBiz financial statements. The Auditor Defendant's audits failed to show: (a) the millions of dollars owed by RealBiz to Monaker at the time, or, (b) the fact that Monaker was using Class investment funds to support RealBiz's operations.

45. The D&O Defendants did not only issue financially misleading public information in their roles as CEO, CFO, and board member for RealBiz; they also perpetuated the fraud by issuing materially misleading financial information in connection with their roles as CEO, CFO, and board member for Monaker.

46. In Monaker's 10-Q filing with the SEC for the quarterly period ended February 28, 2015, Monaker's "due to RealBiz" totaled $974,889.  Monaker now admits that it was, in fact, owed up to $11.1M from RealBiz at the point in time this 10-Q was filed. The

D&O Defendants once again failed to alert the Class that their investment funds were being used to support an entirely separate company, RealBiz.

47. In Monaker's 10-K filing with the SEC from June 16, 2015, Monaker's "due to RealBiz" totaled $1,286,421. Monaker now admits that it was, in fact, owed up to $11.1M from RealBiz at the point in time this 10-K was filed. None of Monaker's 10-K filings during the Class Period showed Monaker being owed any money from RealBiz, despite Monaker's recent admission that Monaker was owed millions of dollars from RealBiz during this period of time. The D&O Defendants once again failed to alert the Class that their investment funds were being used to support an entirely separate company, RealBiz.

48. In Monaker's 10-Q filing with the SEC from January 19, 2016, Monaker's "due to RealBiz" totaled $1,286,421. Monaker now admits that it was, in fact, owed up to $11.1M from RealBiz at the point in time this 10-Q was filed. The D&O Defendants once again failed to alert the Class that their investment funds were being used to support an entirely separate company, RealBiz.

49. The Auditor Defendant verified that the amounts depicted in the aforementioned Monaker 10-K filings were accurate by issuing clean audits opinion for Monaker showing Monaker owing RealBiz the aforementioned amounts on the Monaker financial statements. The Auditor Defendant's Monaker audits failed to show: (a) the millions of dollars owed by RealBiz to Monaker at the time, or, (b) the fact that Monaker was using Class investment funds to support RealBiz's operations.

50. In each 10-Q and 10-K SEC filing above, Defendant Kerby and Mr. Friedman signed off on the accuracy of the financial results under Sarbanes-Oxley Certifications. The Section

302 Certifications, which accompanied the Monaker and RealBiz public financial disclosures, and which were signed by Defendant Kerby and Mr. Friedman during the Class Period, included the following material attestations that would provide comfort to the Class that the class members were investing based on accurate financial information:

a.  I have reviewed this Quarterly report;

b.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

c.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

d.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

(i)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(ii)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(iii) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(iv) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

e.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors;

(f) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(g) Any fraud, whether or not material, that involves management or any other employees who have a significant role in the registrant's internal control over financial reporting.

51. The Section 302 Certification Release requires that every public company's CEO and CFO (in this instance Defendant Kerby and Mr. Friedman) provide a certification in their company's quarterly and annual financial reports. In addition, the Section 302 Certification requires a public company to develop and implement internal disclosure controls and procedures designed to guarantee that its quarterly and annual reports are accurate and complete.

52. The Section 302 Certification can be broken down into three distinct parts: (1) accuracy and fair presentation of the report's disclosure, (2) establishment and maintenance of disclosure controls and procedures, and (3) reporting of deficiencies in, and changes to, internal accounting controls. The Section 302 Certification is intended to provide the public investors with confidence that the financial information included within the public company filings is accurate and reliable for the public's investment decisions.

53. Because the reliability of the information included within a 10-K and 10-Q filing is so critical to the public who choose to invest in a company, the penalties and liability that result from a false Section 302 Certification are severe. A CEO or CFO signing a false Section 302 Certification potentially could be subject to an SEC enforcement action for

violating Section 13(a) of the Securities Exchange Act and private actions under Section 10(b) of the Exchange Act and Rule 10b-5.

54. Under Section 906 Certifications, which were also made by the Defendant Kerby and Mr. Friedman during the Class Period, any individual who certifies a 906 statement knowing that the periodic report accompanying the statement does not comport with all the 906 requirements "shall be fined not more than $1,000,000 or imprisoned not more than 10 years, or both." *See 18 U.S.C. § 1350 (c)(1)*. For any person who "willfully certifies" such a statement "knowing" that it does not comply, the penalties are much higher: up to $5 million and/or 20 years. *Id. at (c)(2)*. The critical importance of accurately reporting financial information is underscored by the strict penalties that accompany the Sarbanes-Oxley and other regulations for public companies.

55. Here, Defendant Kerby and Mr. Friedman acknowledge that their 302 and 906 Certifications included materially misleading information to the Monaker investors. The Class members were materially misled by Defendant Kerby and Mr. Friedman's continued assurances that Monaker's financial statements were accurate, subject to reliable internal controls, and did not contain any material untrue statement of fact.

**c. The D&O Defendants knew their financial statements were materially misleading when they were publicly disclosed to the Class.**

56. The D&O Defendants knew at all times that the vast majority of Monaker funds were not being used to support Monaker's operations and to meet the goals and objectives that were outlined within the Monaker press releases, SEC filings, and other public statements concerning Monaker's plans to increase and grow its business operations.

57. The fact that Monaker failed to publicly disclose the fact that up to $11.1M of Monaker funds were used to support separate company, RealBiz, was not something that the

D&O Defendants first discovered in June 2016 when they decided to alert the public to the need for a restatement of the prior financials.

58. In an affidavit signed by Defendant Kerby, Monaker stated that "Monaker and RealBiz were affiliates of one another from approximately October 9, 2012 to July 2015. Prior to October 31, 2014, Monaker had a controlling ownership stake in RealBiz. During such times, Monaker and RealBiz engaged in numerous intercompany transactions, which, at the time, *Monaker did not account for under the presumption that what was beneficial for one company was beneficial for both companies*." *See Exhibit "A"* (emphasis added). This damning admission shows that Monaker and the D&O Defendants knew all along that they were transferring Monaker funds to support RealBiz's operations without disclosing the same to Monaker investors.

59. While Monaker may have had a controlling interest in RealBiz for a period of time, the two companies were entirely separate entities—with a separate set of investors; separate and distinct business plans; separate SEC filings and disclosures; separate audited financials; and separate stock agreements with its investors.  The Class investors who thought they were investing in Monaker's travel business were unwittingly supporting RealBiz's real estate marketing business with their invested funds.

60. Defendant Kerby also admits in his affidavit that "Monaker had potentially lost more than 100% of its investment in RealBiz by November, 2013 and had raised over $9 million, via the Dual Convertible Preferred Stock, most of which was for the benefit of RealBiz." *Id*. Monaker was raising money from the Class for its disclosed plans to grow the travel business, but Defendant Kerby admits in his affidavit that by November 2013, somewhere close to $9M of Class funds were used to support RealBiz's entirely separate

real estate business.   This fact was not disclosed to the Class or within Monaker's SEC filings, Sarbanes-Oxley Certifications, or audited financials.  Quite simply, there was nothing publicly available that would show the Class that their investment funds were primarily being used to support the operations of a company that had nothing to do with the travel business plan disclosed by Monaker.

61. Defendant Kerby astonishingly acknowledges in his affidavit "there was not an expectation of any cash being exchanged between the companies related to the balances in the intercompany accounts" (between Monaker and RealBiz). *Id*. Thus, Defendant Kerby admits that Monaker and the D&O Defendants knew at all times that Monaker was transferring its funds when RealBiz needed the funds to survive, but Monaker and the D&O Defendants had no intention of ensuring that Monaker and its investors receive any consideration or value for the fact that the investor funds were being used to support an entirely separate company from the one they were investing with. None of this material information was disclosed by the Defendants to the Class during the Class Period.

62. Finally, in his affidavit, Defendant Kerby admits that when he was ousted from his role as CEO of RealBiz in 2015, the D&O Defendants tried to negotiate a deal with the new RealBiz board whereby Monaker would receive $0 in exchange for the up to $11.1M that Monaker previously provided to RealBiz if RealBiz agreed to walk away from the $1.3M in debt owed from Monaker to RealBiz as shown on RealBiz's financial statements.  *Id*. Thus, the D&O Defendants were trying to cut a deal with RealBiz whereby up to $11.1M in Class funds would be extinguished if RealBiz agreed to forego its ability to collect on $1.3M due from Monaker to RealBiz.  Such a deal would clearly

be to the financial detriment of all Class Members who invested their funds with Monaker. Yet, the D&O Defendants unsuccessfully tried to negotiate such a deal so that they could hide the fact that up to $11.1M of the class member funds were used to support an entirely separate company as opposed to Monaker.

63. Because the D&O Defendants implemented a secret plan to use Monaker invested funds for RealBiz's operations and benefit, Monaker was never able to financially invest in the research and development required to accomplish the selling points that were used to solicit the investments from the Class. Consequently, Monaker was never profitable during the Class Period.  Instead, it sustained around $20M in net losses during the Class Period.

**d.  Monaker's CEO and CFO admit their misdeeds under oath.**

64. Monaker and RealBiz are engaged in litigation pertaining to the undisclosed transfer of funds between the two companies.  *See RealBiz Media Group, Inc. v. Monaker Group, Inc*., Case No. 1:16-cv-61017-FAM, pending in the United States District Court Southern District of Florida Fort Lauderdale Division.

65. On or about September 6, 2016, Defendant Kerby was deposed in connection with the financial statements issued by Monaker that now are being restated.   During his deposition under oath, Defendant Kerby testified as follows:

> a.  Monaker and RealBiz were separate public companies that did not maintain the same set of investors during the Class Period;
>
> b.  He knows it is important to provide accurate financial information to investors and potential investors when raising money;

c.   He admits that there was a time period when investors were receiving materially inaccurate financial information when they invested with Monaker;

d.   Monaker believes that its prior financial statements were misstated and there is a duty under Sarbanes-Oxley to correct the previous material deficiencies;

e.   There was nothing within Monaker's publicly-filed financial statements that would indicate to an investor the fact that Monaker had no intention trying to recover the millions of dollars Monaker was providing to RealBiz without consideration;

f.   He now admits that Monaker should have received some form of consideration for the around $10M that Monaker provided to RealBiz.

g.   Although he did not want to issue a restatement of Monaker's prior financials, Monaker's new auditors have advised Monaker that a restatement of their previously issued financial statements is necessary because of material misstatements in the past;

h.   He believes the Auditor Defendants made material accounting mistreatments in connection with their prior audit opinions on Monaker's financial statements;

i.   Monaker's CFO, Mr. Friedman, decided that he would treat Monaker and RealBiz as one company, and consequently, Mr. Friedman would move all moneys from one company into the other company and make all payments from the one company, which was Monaker.  Defendant

Kerby was aware of, and did not object to, the aforementioned decision on the part of Mr. Friedman;

j.  He believes that Mr. Friedman made significant accounting errors in connection with Monaker's accounting for the money transferred to RealBiz when Mr. Friedman served as Monaker's CFO;

k.  He admits that the Monaker financial statements were not recorded in a manner that would show investors that Monaker money was being used to support RealBiz's operations;

l.  He admits that Monaker's financial statements should have been recorded in a manner to show investors that Monaker was using its investor funds to support RealBiz's operations;

m.  He did not see a fundamental problem with treating Monaker and RealBiz as if they were one company when moving money from Monaker to support RealBiz;

n.  He admits that there was a potential conflict of interest that existed with respect to serving as the simultaneous CEO for Monaker and RealBiz, and that this conflict of interest was not explicitly disclosed to the Monaker investors;

o.  He acknowledges that the CEO and CFO of a company are responsible for maintaining accurate financial statements;

p.  He would review the Monaker financial statements that were provided to the Auditor Defendants before they were audited;

q. He read and reviewed Monaker's SEC filings, including its 10-K and 10-Q filings, before signing the Sarbanes Oxley Certifications attesting the accuracy of the information contained therein;

r. He has a basic understanding of accounting principles since he has taken securities courses, is a licensed Canadian financial advisor, and is able to understand balance sheets, accounts receivable and accounts payable;

s. Besides its CFO, Monaker employed an accountant specializing in SEC accounting, as well as SEC legal counsel;

t. Monaker has around 600-800 shareholders;

u. Monaker has an $86M accumulated deficit, and Monaker lost around $20M of investor funds during the Class Period;

v. Monaker has spent hundreds of thousands of dollars restating its financial statements, which has further drained Monaker's financial position;

w. Monaker's head of investor relations during the Class Period had a prior conviction and prison sentence for securities fraud violations stemming from his prior employment.  Monaker hired this individual despite knowledge of the prior securities fraud conviction and prison sentence.

66. On or about August 30, 2016, Mr. Friedman was deposed in connection with the financial statements issued by Monaker that now are being restated.  During his deposition under oath, Mr. Friedman testified as follows:

a.  He was the CFO and worked alongside a competent SEC accountant hired by Monaker;

b.  As CFO, his job was to ensure the public financial data included within the SEC filings was correct;

c.  He knows the public needs to rely on the financial data it receives when making a proper investment decision, which is why it is important for a company such as Monaker to issue reliable financial statements to the public;

d.  He never disagreed with the Auditor Defendant with respect to the Auditor Defendant's audit opinions with respect to the Monaker financial statements;

e.  When RealBiz needed money for its operations, he would transfer money from Monaker to RealBiz;

f.  There was nothing on Monaker's public financials that would indicate to investors that Monaker was funding RealBiz's operations and that Monaker had no intention of being reimbursed by RealBiz;

g.  He does not believe that an investor could reasonably interpret the Monaker financial statements to indicate the fact that Monaker was providing millions of dollars to RealBiz;

h.  He believes there was an obvious conflict of interest with respect to the fact that the D&O Defendants served in the same position for two separate companies, RealBiz and Monaker, given the money transfers between the two companies;

     i.   Monaker lost about $20M of its investor funds during the Class Period; and

     j.   Monaker kept accurate records of the amount of money that Monaker provided to RealBiz, but this was never shown on Monaker's public financial statements.

67. Consequently, the D&O Defendants acknowledge that they knew Monaker's financial statements were not alerting the Class investors to the fact that their investments were primarily being used to support a separate company's operations.   Despite this knowledge, Monaker, through the D&O Defendants, continued to materially mislead the Class by issuing Certified SEC Filings that failed to alert the investors to this critical and highly material fact that would obviously be important with respect to the investment decision to acquire and hold on to the Monaker investment.

**e.  The Auditor Defendant failed to catch and report the fraud within their publicly-filed audit opinions.**

68. At all times, the Auditor Defendant knew that its audit opinions for Monaker would be included within Monaker's public 10-K filings.  Therefore, the Auditor Defendant knew that Monaker's investors, including the Class, would be relying on their public audit opinions.

69. The Auditor Defendant was in a superior position to catch the fact that the Monaker financial statements were materially misstated given the fact that the D&O Defendants hired the Auditor Defendant to serve as the auditor for both Monaker and RealBiz.  This allowed the Auditor Defendant to audit the financial statements for both Monaker and RealBiz, and identify the intercompany financial activity that was materially and continuously flowing between the two companies.

70. As opposed to catching the secret and substantial monetary transfers from Monaker to RealBiz, the Auditor Defendant allowed these transfers to go undetected for years. The Auditor Defendant's negligence is underscored by the fact that the Auditor Defendant reviewed and analyzed the Monaker and RealBiz bank statements during the class period, including those statements related to the intercompany account.

71. The fact that Monaker's assets continuously hovered around $7M during the Class Period amplifies the material nature of the undisclosed fact that Monaker transferred around $11.M of its funds to RealBiz during the class period. Yet, the Auditor Defendant simply failed to uncover such a material discrepancy when auditing either Monaker or RealBiz.

72. Furthermore, the Auditor Defendant was paid its audit fees for RealBiz from Monaker, including a $10,000 payment in December 2012, a $5,000 payment in February 2013, $5,000 and $9,500 payments in September 2013, a $5,000 payment in November 2013, a $5,000 payment in December 2013, a $10,000 payment in February 2014, a $5,000 payment in March 2014, a $5,000 payment in May 2014, a $5,000 payment in December 2014, $10,000 and $14,000 payments in January 2015, a $10,000 payment in March 2015, and a $5,000 payment in April 2015, but this was not noted within the audit opinions issued by the Auditor Defendant or the public financial statements issued by Monaker.

73. A review of publicly-filed information in the ongoing litigation between Monaker and RealBiz shows highly questionable audit entries that were allowed by the Auditor Defendant during the Class Period. One such example includes an $18,195,665.00 audit adjustment entry made by the Auditor Defendant that allowed the balance sheet to

balance in furtherance of issuing a clean audit opinion.  The note simply states: "To record final year end audit adjustment at 2/28/15." There is no mention of this odd and significant $18M audit adjustment within the Auditor Defendant's audit opinion even though the size of this audit adjustment entry dwarfs the roughly $7M in assets shown at the same time on Monaker's audited balance sheet. Instead, the clearly material audit adjustment seems to be a mechanism to back door into a needed number required to balance Monaker's financials without any accounting justification for the same.

74. As part of its audit procedures, the Auditor Defendant relied overwhelmingly on audit confirmation letters signed by the D&O Defendants, which supported the fraudulent numbers that were ultimately included in Monaker's materially misstated financial statements.

75. The Auditor Defendants breached their obligation to exercise professional skepticism pursuant to SAS No. 99.  SAS Numbers 99 and 31 demand that auditors recognize that fraud may exist in every audit, and an auditor shall not rely solely upon a company's internal audit confirmation letter when evidence can be obtained from independent sources outside an entity.

76. Further, SAS 45 clearly acknowledges that possibility that a relate party relationship, such as the one that existed between Monaker and RealBiz, may be a tool for fraud by management.  SAS 6 was issued primarily for auditors in response to fraud cases in which management's involvement in material transactions was obscured by either inadequate disclosure or outright concealment.  The auditing standards require that an auditor should view related-party transactions within the framework of existing pronouncements, placing primary emphasis on the adequacy of disclosure.

77. According to AU 334.09, procedures that should be considered by an auditor when auditing related party transactions are:

   (i)  Obtaining an understanding of the transaction's business purpose;

   (ii) Examining invoices, executed copies of agreements, contracts, and other pertinent documents, such as receiving reports and shipping documents.

   (iii) Determining whether the transaction has been approved by the board of directors or other appropriate officials.

   (v) Testing for reasonableness the compilation of amounts to be disclosed or considered for disclosure.

   (vi) Inspecting or confirming and obtaining satisfaction that collateral is transferable and appropriately valued.

   (vii) For inter-company account balances (a) Arranging for examination at concurrent dates, even if fiscal years differ (b) Arranging for examination of specified, important, and representative related party transactions by auditors for each of the parties with an exchange of relevant information.

78. When auditing the Monaker financial statements, the Auditor Defendant breached the professional standards and duties outlined herein.

79. By failing to identify the fact that Monaker's financial statements included fraudulent amounts that did not account for millions of dollars of Monaker funds being used to support RealBiz, the Auditor Defendant assisted the Director Defendant's concealment of the true financial condition of Monaker. The Auditor Defendant knew that the purpose of Monaker's SEC filings was to benefit and guide Monaker investors with their investment decision.

80. The Auditor Defendants knew that its Monaker audits were included in Monaker's public financial disclosures that were circulated to the Plaintiff and Class Members. The Auditor Defendants knew that the Plaintiff and Class Members would justifiably rely upon their clean audit opinions issued with respect to Monaker.

**(e)  The Truth begins to be revealed to the Class Members.**

81. Up until June 2016, Monaker kept the fact that it was funding RealBiz (to the tune of up to $11.1M) a total secret to the public and the Class.

82. The Defendants' secret with respect to the true state of Monaker's financial statements started to unravel when RealBiz informed Monaker via a April 29, 2016, litigation hold letter that RealBiz demanded payment for the approximately $1.3M amount due from Monaker to RealBiz as depicted on the current financial statements for the companies.[1]

83. In response, on May 2, 2016, the D&O Defendants sent a letter to RealBiz and the Auditor Defendant stating:

> "Through various discussions with our legal counsel and accountants, we have become aware of the fact that the prior audit confirmation letter dated February 9, 2016 to RealBiz Media Group, Inc. (the "Letter") contained an error.  Specifically, while the prior Letter stated that Monaker Group, Inc. owed RealBiz Media Group, Inc. $1,287,517 as of October 31, 2015, in actuality RealBiz Media Group, Inc. owes Monaker Group in excess of $5.8 million as of October 31, 2015. Please update your records accordingly.[2]

84. As evidenced by the D&O Defendants' testimony cited in this complaint, the D&O Defendants knew Monaker was owed millions of dollars from RealBiz for many years before sending this initial letter in early May 2016. Nevertheless, Monaker continued to

---

[1] See Case 0:16-cv-61017-FAM DE 35-10
[2] *Id. at DE 35-9.*

keep this material disclosure private and this significant disclosure was not immediately disclosed to the Class via an SEC filing.

85. It wasn't until Monaker's 10-K filed on June 23, 2016 that Monaker disclosed that it would be using a new auditor, LBB & Associates Ltd., LLP, to issue restatements with respect to Monaker's previous financial statements that were audited by the Auditor Defendant. Despite the D&O Defendant's ongoing knowledge that Monaker was secretly funding RealBiz for years, this 10-K filing on June 23, 2016, was the first inclination that the Class could glean that their investment decisions were materially hindered to their great detriment based on fraudulent and materially misleading financial statements.

86. Also important, unlike the D&O Defendant's private letter to RealBiz and the Auditor Defendant saying Monaker was owed "in excess of $5.8M" from RealBiz, Monaker's 10-K filed nearly two months later stated Monaker was owed up to $11.1M from RealBiz. Less than one month later, on July 15, 2016, Defendant Kerby filed a public affidavit saying Monaker was owed approximately $9.9M from RealBiz.[3]

87. The Class was completely left in the dark regarding the D&O Defendant's intentional usage of Monaker as RealBiz's personal piggy bank during the Class Period. Instead of investing the Class Member's invested funds to grow Monaker pursuant to the plans outlined in Monaker's SEC filings, press releases, and other public disclosures, Monaker and the D&O Defendants used their funds to financially support a flailing entirely separate company with a separate and distinct set of shareholders. At the same time, the Monaker stock fluctuated rapidly during the Class Period and ultimately lost about $20M in Class Member funds.

---

[3] *Id. at DE 23-1*

**(f) Additional Scienter Allegations.**

88. The D&O Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the investing public. The ongoing fraudulent scheme described herein could not have been perpetrated over a substantial period of time without the knowledge and complicity of the personnel at the highest level of Monaker, including the D&O Defendants.  The D&O Defendants were motivated to materially misrepresent the true nature of Monaker's financials because it allowed these same individuals to try to prop up the share price of their other company, RealBiz, as opposed to allowing RealBiz to flounder into a total loss. At the same time, by materially misrepresenting Monaker's financial condition to the public, the D&O Defendants could continue to raise money and attempt to increase the Monaker share price based on dreams that were being unfulfilled based on secret capital drain towards RealBiz's operations. The D&O Defendants hoped to keep the share prices of both of their companies, Monaker and RealBiz, artificially high, which was particularly enticing to the D&O Defendants since they were significant shareholders in each company.

**(g) Loss Causation/Economic Loss.**

89. During the Class Period, as detailed herein, the D&O Defendants engaged in a scheme to deceive the market and a course of conduct that artificially impacted Monaker's stock price in a manner that operated as a fraud or deceit on acquirers of Monaker's stock.

90. As detailed above, Monaker's stockholders lost approximately $20,000,000 in Class investment funds as a result of the fact that Monaker never accomplished its lofty goals and objectives because Monaker was not using the invested funds to support Monaker; instead, the invested funds were secretly diverted to support an entirely separate

company with a separate set of investors. The timing and magnitude of the Class losses negates any inference that the loss suffered by Plaintiff and the Class was caused by changed market conditions, macroeconomic or industry factors or Monaker-specific facts unrelated to the fraudulent conduct.

91. As admitted by Defendant Kerby under oath, the vast majority of the Class funds were not used to support Monaker in any fashion.  Without utilizing Monaker's invested capital, it was essentially impossible for Monaker to meaningfully succeed with any of the projected goals and objectives required for Monaker to become a profitable company and sought after stock that would actually increase in value.  Common sense leads to the conclusion that Monaker's supposed plans to become a significant travel industry business was thwarted by the fact that Monaker's invested capital was not used to grow Monaker's business plans.  Instead, Monaker's invested capital was used to try to grow and prop up a real estate business (RealBiz) that was never disclosed as Monaker's plan in any public filings or information. The economic loss, i.e., damages, suffered by Plaintiff and the other Class members was a direct result of the fraudulent scheme to solicit their invested funds for an entirely separate company. No rational investor, such as the Plaintiff, would invest their hard-earned money in a company that was not using the invested capital to support the company's intended and publicly stated purpose.

92. At all material times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the Plaintiff and other Class members. Those statements were materially false and misleading because they failed to disclose the true and accurate picture of Monaker's financial statements, as well as the fact that Monaker did not intend on using the

invested funds to benefit Monaker's operations. Throughout the Class Period, the Defendants publicly issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading. Plaintiff and other Class members purchased Monaker stock based on materially false and misleading information causing them to suffer the damages complained of herein.

93. The statutory safe harbor under the Private Securities Litigation Reform Act of 1995 does not apply to any of the allegedly false and misleading statements pled in this Complaint.  The statements that Monaker and the D&O Defendants now admit under oath to be materially misleading and false all related to then-existing facts and conditions.  Additionally, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not adequately identified as "forward-looking statements" when made, and there was no cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, Defendants are liable for any purported forward-looking statements because at the time of any forward-looking statement, the particular speaker had actual knowledge that any particular forward-looking statement was materially false or misleading given the fact that Defendant Kerby admits Monaker had no intention on seeking repayment of the Class invested funds being secretly transferred to RealBiz.

## COUNT I (Against D&O Defendants)
## VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT

94. Plaintiff repeats and re-alleges paragraphs 1-93.

95. This Count is asserted against the D&O Defendants for violations of Section 15, 15 U.S.C. § 77o, of the Securities Act on behalf of all members of the Class who purchased or otherwise acquired Monaker stock during the Class Period.

96. At all relevant times, the D&O Defendants were controlling persons of Monaker within the meaning of the Securities Act.   The D&O Defendants at all relevant times participated in the operation and management of Monaker, and conducted and participated, directly and indirectly, in the conduct of Monaker's business affairs. As officers and directors of a publicly-owned company, the D&O Defendants each had a duty to disseminate accurate and truthful information with respect to Monaker's financial condition and results of operations.

97. By their violations of the Section 15, 15 U.S.C. § 77o, of the Securities Act, the D&O Defendants caused all members of the Class who purchased or otherwise acquired Monaker stock during the Class Period to suffer economic injury and loss.

## COUNT II (Against Monaker and D&O Defendants)
## VIOLATIONS OF SECTION 17(a)(1) OF THE SECURITIES ACT

98. Plaintiff repeats and re-alleges paragraphs 1-93

99. This Count is asserted against Monaker and the D&O Defendants for violations of Section 17(a)(1), 15 U.S.C. § 77g(a)(1), of the Securities Act on behalf of all members of the Class who purchased or otherwise acquired Monaker stock during the Class Period.

100.   Monaker's SEC filings identified herein included untrue statements of material fact and omitted other facts necessary to make the statements not misleading.

101.   Defendant Kerby and Mr. Friedman each signed the subject SEC filings under Sarbanes-Oxley Certification on behalf of Monaker and were directors when the filings

were publicly submitted. These material misrepresentations and omissions of material fact were made in connection with the sale of securities with scienter and using the requisite jurisdictional means.

102.    Monaker and the D&O Defendants had an intent or showed extreme recklessness to defraud the Plaintiff and Class in a manner that overwhelmingly reduced the risk that the investors would face when investing with Monaker. Monaker and the D&O Defendants' conduct evidenced an extreme departure from the standards of ordinary care which presented a danger of misleading the Plaintiff and Class.

103.    Plaintiff and other members of the Class who acquired Monaker securities did not know of the misrepresentations alleged herein or the of the facts concerning the untrue statements of material fact and omissions alleged herein, and could not have reasonably discovered such facts or conduct.

104.    Plaintiff and the other members of the Class have sustained economic injury and loss. Defendant Kerby admits that around $20M of investor funds were lost during the Class Period. The Plaintiff lost roughly 90% of his investment with Monaker.

105.    By reason of the foregoing, the Defendants named in this Count are liable under the Securities Act to Plaintiff and the other members of the Class who acquired Monaker stock during the Class Period.

**COUNT III (Against D&O Defendants)**
**VIOLATIONS OF SECTION 10(b) AND RULE 10-b-5**
**OF THE EXCHANGE ACT**

106.    Plaintiff repeats and re-alleges paragraphs 1-93.

107.     This Count is asserted against the D&O Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

108.     Pursuant to the above plan, scheme and course of conduct, each of the D&O Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to the public that were designed to influence the market for Monaker's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Monaker's finances, business plans, and prospects.

109.     By virtue of their positions at Monaker, the D&O Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, the D&O Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to these Defendants. Said acts and omissions of D&O Defendants were committed willfully or with reckless disregard for the truth. Each D&O Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

110.     Information showing the D&O Defendants acted knowingly or with reckless disregard for the truth was at all times within these defendants' knowledge and control.

As the senior managers and directors of Monaker, the D&O Defendants each had knowledge of the details of Monaker's internal affairs.

111.    The D&O Defendants are liable both directly and indirectly for the wrongs alleged herein.  Because of their positions and control and authority, the D&O Defendants were able to and did, directly and indirectly, control the content of the statements of Monaker.  As officers and directors of a publicly held company, the D&O Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Monaker's businesses, operations future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Monaker's securities was artificially inflated throughout the Class Period.  Ignorant of the adverse facts concerning Monaker's financial condition and true business plans that were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Monaker securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by these defendants, and were damaged as a result of same.

112.    During the Class Period, Monaker's securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements addressed herein, which these defendants issued or caused to be disseminated, or relying on the integrity of the market, purchased or acquired shares of Monaker's securities at prices artificially inflated by these defendants' wrongful conduct.  Had the Plaintiff or other members of the Class known the truth, they would not have purchased or otherwise acquired the Monaker securities,

or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of acquiring or purchasing Monaker stock, the true value of the Monaker securities was substantially lower than the prices paid by Plaintiff and the Class members.

113.    Consequently, the D&O Defendants knowingly or recklessly, directly or indirectly, violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 by: (1) employing devices, schemes and artifices to defraud, (2) failing disclose material information, or (3) engaging in acts and a course of business that operated as a fraud and decip upon Plaintiff and the other members of the Class during the Class Period.

114.    As a direct and proximate result of the D&O Defendants' wrongful conduct, Plaintiff and the Class members suffered economic injury and loss in connection with their respective purchases, acquisitions, and sales of Monaker securities during the Class Period.

### COUNT IV (Against D&O Defendants)
### VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT

115.    Plaintiff repeats and re-alleges paragraphs 1-93.

116.    During the Class Period, the D&O Defendants participated in the operation and management Monaker, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's misstatement of income and expenses and false financial statements.

117.    As officers and/or directors of a publicly owned company, the D&O Defendants had a duty to disseminate accurate and truthful information with respect to Monaker's

financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

118.     Because of their positions of control and authority as senior officers, D&O Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Monaker disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the D&O Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. Therefore, the D&O Defendants were "controlling persons" of Monaker within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Monaker securities.

119.     The D&O Defendants are liable pursuant to Section 20(a) of the Exchange Act for these violations committed by Monaker, which caused the Plaintiff and the Class to suffer economic injury and loss.

### COUNT V (Against Auditor Defendant)
### VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT

120.     Plaintiff repeats and re-alleges paragraphs 1-93.

121.     This Count is asserted against the Auditor Defendant for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

122.     Pursuant to the above plan, scheme and course of conduct, the Auditor Defendant participated directly or indirectly in the preparation and/or issuance of the quarterly and annual financial reports, SEC filings, including multiple clean audit opinions for Monaker that were made to the public and were designed to influence the market for

Monaker's securities. The Auditor Defendant's Monaker audit opinions were materially false and misleading in that they failed to disclose materially adverse information and misrepresented the truth about Monaker's finances.

123.     The Auditor Defendant acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts as would reveal the materially false and misleading nature of the financial statements made by Monaker, although such facts were readily available to these Defendants. This is especially true given the fact that the Auditor Defendant audited the financial statements of both Monaker and RealBiz during the Class Period and was in an overwhelmingly superior position to identify the fraud on the part of Monaker and the D&O Defendants.  Said acts and omissions of the Auditor Defendant were committed with reckless disregard for the truth. As the longtime auditor for Monaker, the Auditor Defendant had in depth knowledge of the details of Monaker's internal and financial affairs, including the relationship involving the intercompany account between Monaker and RealBiz that was kept secret to the Plaintiff and Class.

124.     The Auditor Defendant was able to and did, directly and indirectly, control the content of its audit opinions for Monaker.  The Auditor Defendant had a duty to disseminate accurate and truthful information with respect to Monaker's financial condition. As a result of the dissemination of the aforementioned false and misleading audit opinions, the market price of Monaker's securities was artificially inflated throughout the Class Period.  Ignorant of the adverse facts concerning Monaker's financial condition and true business plans that were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Monaker securities at artificially inflated prices and relied upon the price of the securities, the integrity of

the market for the securities and/or upon statements that the Auditor Defendant knew was being publicly disseminated, and were damaged as a result of same.

125.     Consequently, the Auditor Defendant recklessly, directly or indirectly, violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 by failing disclose material information to Plaintiff and the other members of the Class during the Class Period.

126.     As a direct and proximate result of Auditor Defendant's reckless conduct, Plaintiff and the Class members suffered economic injury and loss in connection with their respective purchases, acquisitions, and sales of Monaker securities during the Class Period.

## COUNT VI  (Against Auditor Defendant)
## NEGLIGENT MISREPRESENTATION

127.     Plaintiff repeats and re-alleges paragraphs 1-93.

128.     The Auditor Defendant negligently audited Monaker's financial statements during the Class Period, and the Auditor Defendant's audit opinions were knowingly distributed to the Plaintiff and Class by virtue of Monaker 10-K filings that included the Auditor Defendant's audit opinion.

129.     The Auditor Defendant received substantial compensation as the independent auditor for Monaker during the Class Period.

130.     In the course of the Auditor Defendant's profession, the Auditor Defendant supplied audit opinions including false information to Monaker.  The Auditor Defendant knew that its audit opinions for Monaker would be supplied for the guidance of others in their business transactions, most notably with respect to investment decisions on the part of the public on whether: (a) to invest, and what amount, with Monaker, and (b) to sell Monaker stock at any point in time.

131.    The Plaintiff and members of the class relied upon the audit opinions issued by the Auditor Defendant, and they lost a considerable amount of money after investing based upon financial statements that were materially false and were required to be restated by a new auditing firm.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on his own behalf and on behalf of the Class, prays for judgment as follows:

(a)    Determining this action to be a proper class action, certifying Plaintiff as class representative, and naming Plaintiff's counsel as Class Counsel under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all Defendants, jointly and severally, for the damages sustained as a result of the wrongdoings of Defendants, together with interest thereon;

(c)    Awarding, from the Defendants, Plaintiff the fees and expenses incurred in this action including reasonable allowance of fees for Plaintiff's attorneys and experts, and awarding, from any common fund or benefit, Plaintiff's attorneys a reasonable fee based on the benefit conferred on the Class;

(d)    Granting extraordinary equitable and/or injunctive relief as permitted by law, equity and federal and state statutory provisions sued on hereunder;

(e)    Awarding rescission damages as to claims under the Securities Act; and

(f)    Granting such other and further relief as the Court may deem just and proper.

**TRIAL BY JURY**

Plaintiff demands a trial by jury on all counts so triable.


Respectfully submitted,

/s/ John G. Crabtree


John G. Crabtree
Florida Bar No. 886270
Charles M. Auslander
Florida Bar No. 349747
George R. Baise Jr.
Florida Bar. No. 0111805
Brian C. Tackenberg
Florida Bar No. 0107224
CRABTREE & AUSLANDER
240 Crandon Boulevard, Suite 101
Key Biscayne, Florida 33149
Telephone (305) 361-3770
jcrabtree@crabtreelaw.com
causlander@crabtreelaw.com
gbaise@crabtreelaw.com
btackenberg@crabtreelaw.com
floridaservice@crabtreelaw.com