**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 0:16-cv-62902-WJZ

WILLIAM MCLEOD & RONALD MIMS,
Individually and on behalf of all others
similarly situated,

      Plaintiff,

v.

MONAKER GROUP INC., formally known as
NEXT 1 INTERACTIVE, INC., WILLIAM
KERBY, DON MONACO, and D'ARELLI
PRUZANSKY, P.A.,

      Defendants.

_____/

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO**
**MONAKER GROUP, INC., WILLIAM KERBY, AND DON MONACO'S**
**MOTION TO DISMISS THE AMENDED COMPLAINT**

The Plaintiffs, William McLeod and Ronald Mims, submit this Memorandum of Law in Opposition to the motion to dismiss filed by Monaker Group, Inc., William Kerby, and Don Monaco.  (Dkt. 67).

## ARGUMENT

### I.    LEGAL STANDARDS ON MOTION TO DISMISS

Under Rule 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must allege "enough facts to state a claim to relief that is plausible on its face," and the factual allegations "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).  "For purposes of this analysis, 'all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff.'" *FindWhat Inv'r Group v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011) (quoting *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1261 (11th Cir. 2006)).

In cases alleging violations of section 10(b) of the Securities Exchange Act of 1934, certain elements of the claim are subject to heightened pleading requirements.  Specifically, with respect to the allegations concerning misrepresentations or omissions and scienter, a complaint must comply with the heightened pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). *FindWhat Inv'r Grp.*, 658 F.3d at 1296.

The Eleventh Circuit has cautioned, however, "Rule 9(b) must not be read to abrogate Rule 8, . . . and a court considering a motion to dismiss for failure to plead fraud with particularity should always be careful to harmonize the directive of Rule 9(b) with the broader policy of notice pleading." *Friedlander v. Nims*, 755 F.2d 810, 813, n.3 (11th Cir. 1985).

### II.   PLAINTIFF SUFFICIENTLY PLED A CAUSE OF ACTION UNDER SECTION 10(b) OF THE SECURITIES EXCHANGE ACT OF 1934

#### A.  Introduction

The first complaint alleged two counts against the defendants based on violations of § 10(b).  (Dkt. 1 at 35-39) (Counts III and IV).  To succeed on those claims, the Plaintiff would have to prove: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss, and; (6) loss causation." *In re Galectin Therapeutics, Inc. Sec. Litig.*, 843 F.3d 1257, 1270 (11th Cir. 2016). In their initial motion to dismiss, the Defendants alleged that McLeod had failed to sufficiently allege the

following elements: (1) material misrepresentations or omissions (Dkt. 30 at 6-11); (2) scienter (*id.* at 11-16); (3) reliance (*id.* at 16-17); and (4) loss causation (*id.* at 17-19).

The Court agreed with the Defendants on only one point, concluding that McLeod failed to "adequately allege proximate causation and economic loss." The Court dismissed the counts predicated on § 10(b) with leave to amend by remedying those deficiencies.  (Dkt. 53 at 6). Despite the focus of the Court's order, the Defendants have, once again, challenged the same four 10(b) elements that they attacked in their initial motion to dismiss.  Indeed, aside from the loss causation element, the Defendants have largely transcribed their prior arguments, which McLeod addressed in his initial response.

### B. The Plaintiff Sufficiently Alleged a Material Misrepresentation or Omission
#### i. Misrepresentations and Omissions

"A statement is misleading if in light of the facts existing at the time of the statement a reasonable investor, in the exercise of due care, would have been misled by it." *FindWhat Investor Group*, 658 F.3d at 1305 (quoting *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 863 (2d Cir. 1968)). The "appropriate primary inquiry" is "into the meaning of the statement to the reasonable investor and its relationship to truth." *FindWhat Investor Group*, 658 F.3d at 1305 (quoting *Texas Gulf Sulphur Co.*, 401 F.2d at 862).

The Defendants largely dance around the continuous course of conduct alleged against them surrounding the diversion of funds from Monaker to RealBiz and the failure to disclose that diversion to Monaker's investors.  Despite the fact that Monaker and RealBiz were two separate and distinct companies with two different sets of investors, Monaker transferred millions of dollars to RealBiz in order to support RealBiz's operations.  (Dkt. 58 ¶¶ 2, 39).  The D&O Defendants failed to disclose that diversion, and—in fact—caused financial statements to be issued that conflicted with that diversion.  (Dkt. 58 at ¶¶ 50-53). Only in June 2016 did Monaker determine it would need to issue restatements regarding its past financial statements to make clear that—in irreconcilable conflict with its prior statements—RealBiz actually owed Monaker vast sums of money (because Monaker had secretly diverted funds to RealBiz) as opposed to Monaker owing RealBiz money as Monaker's prior financial statements had stated.   (Dkt. 58 ¶¶ 3, 93).

The context surrounding this series of events is important. Mr. Kerby has been the chairman and Chief Executive Officer of Monaker since 2008 and also served as Chief Executive

2

Officer of RealBiz.  (Dkt. 58 ¶¶ 18, 40).  Mr. Monaco has been on Monaker's board of directors since 2011 and was named chairman of the board in 2015.  (Dkt. 58 ¶ 20). Mr. Monaco was also a member of the RealBiz board of directors.  (Dkt. 58 ¶ 40).  Mr. Kerby and Mr. Monaco owned 40.9% and 55.9% of the voting shares for Monaker. (Dkt. 58 ¶¶ 18-20). These dual roles created conflicts of interest for both Mr. Kerby and Mr. Monaco, and their existence is important because they created an avenue through which those parties could use Monaker as a piggy bank to support RealBiz's operations when RealBiz was short on cash.  *Id.* Mr. Kerby acknowledged under oath that a potential conflict of interest existed with respect to his simultaneous role as CEO for Monaker and RealBiz. (Dkt. 58 ¶ 70(n)).

Mr. Kerby and Mr. Monaco, in their roles at both Monaker and RealBiz, caused financially misleading information to be published by both Monaker and RealBiz.  (Dkt. 58 ¶¶ 44-48, 50-53).  Monaker's 10-K filing issued in June 2015 and the 10-Q filings issued in February 2015 and June 2015 each showed that Monaker owed money to RealBiz—specifically $974,889, $1,286,421, and $1,286,421, respectively.  (Dkt. 58 at ¶¶ 50-53).  In reality, RealBiz owed Monaker up to $11.1 million as a result of the fact that Monaker had been injecting large amounts of money into RealBiz without any notice to Monaker's investors.  (Dkt. 58 at ¶¶ 44). Therefore, while Monaker's financial statements showed a debt owed by Monaker to RealBiz, the financial statements failed to show that RealBiz owed Monaker up to $11.1 million. (Dkt. 58 ¶¶ 52-53). While the Defendants argue that Monaker publicly stated intercompany transactions were eliminated in their financial statements, the undeniable truth is that Monaker and RealBiz continuously did, in fact, publicly disclose intercompany transfers from RealBiz to Monaker in their respective financials. However, the disclosure of the intercompany transfers was both one-sided and materially misleading. Additionally, while the Defendants attempt to downplay the restatement of their financials as something that was required as a result of the fact that Monaker no longer held a controlling ownership interest in RealBiz, the fact is that Monaker's June 2016 financial restatement disclosure occurred *years after* Monaker no longer held a controlling interest in RealBiz and their "accounts (were) no longer consolidated in the accompanying financial statements."

> At February 28, 2014, the Company owned a 61% interest in RealBiz, which owned an 85% interest in RealBiz Holdings, Inc. On October 31, 2014, the Company's interest dropped to 43% in RealBiz. These entities are no longer consolidated in the

> accompanying financial statements because we no longer have a controlling financial interest. All inter-company balances and transactions have been eliminated. The 57% non-controlling interest in RealBiz is represented by 1,009,762 shares of RealBiz Series A Preferred Stock with an annual dividend rate of 10% and 85,799,012 shares of RealBiz common stock issued and outstanding as of February 28, 2015.

(Form 10-K, filed 6-16-2015 at 4).

The Defendants misleadingly argue that Monaker did not need to disclose the payments to RealBiz because the two companies maintained consolidated financial statements. (Dkt. 67 at 9). Setting aside the fallacy of this argument from an accounting standpoint, and the fact that Monaker disclosed only one side of the intercompany transfers throughout the class period, Monaker's financial statements had not been consolidated with RealBiz for the years preceding the June 2016 restatement. *Id*. The Defendants' argument in this respect is provably false.

The Defendants also argue that the Plaintiffs have failed to show that Monaker's 10-Q filings were false. *Id.* at 6. But Monaker admitted as much in June 2016, when it stated in its 10-K filing that $11.1 million in funds had been transferred from Monaker to RealBiz. (Dkt. 58 ¶ 40). Monaker—using a new auditor—was forced to issue restatements with respect to its prior erroneous financial statements. (Dkt. 58 ¶ 93). Contradicting Monaker's arguments for dismissal, Monaker's prior auditor now argues that a compelling inference demonstrates a well concealed fraud at Monaker subverted their good faith audits. (Dkt 68 at pg. 16). Monaker's restated financial statements in June 2016 brought a troubling omission to light: Monaker had been using investor funds to support an entirely separate company with separate investors. (Dkt. 1 ¶¶ 2, 38, 40, 42, 62). Up until that disclosure, there was no way an investor would have known that Monaker was using its funds to prop up another business through an undocumented interest free loan that was never intended to be repaid. (Dkt. 58 ¶¶ 89-95).

The Defendants have also apparently decided to ignore the extensive sworn testimony from Mr. Kerby (through both affidavit and deposition testimony) showing that the Defendants were aware all along that they were transferring Monaker funds to RealBiz, and that the company made significant historical accounting errors that should have been recorded in a manner to show investors that Monaker was using its investor funds to support RealBiz's operations. (Dkt. 58 at ¶¶ 61-72). It is illogical to think that, although Monaker was funding RealBiz, Monaker somehow *owed* RealBiz money as Monaker's 10-K and 10-Q filings showed.

These statements were materially false, and Monaker asserts a patently absurd argument in its Motion that it was unnecessary to disclose the millions it was providing without consideration to RealBiz when Monaker was disclosing the fact it owed RealBiz over $1 million.

The Defendants also argue there was no duty to disclose that Monaker was diverting money to RealBiz.  (Dkt. 67 at 9). That argument, however, is contradicted by the fact that Monaker did, in fact, disclose amounts of money it allegedly owed to RealBiz. (Dkt 58 at ¶¶ 51-53).  Therefore, Monaker's argument falls flat.  Monaker was disclosing intercompany activity, but failed to disclose the other side of the intercompany activity—that RealBiz owed Monaker up to $11.1M.  *See FindWhat Inv'r Group*, 658 F.3d at 1305 ("Rule 10b–5 prohibits not only literally false statements, but also any omissions of material fact 'necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'").

As an example, at the same time that Defendants Kerby and Monaco were officers of RealBiz and Monaker, Monaker disclosed a $1.28 million liability to RealBiz under the "due to affiliates" column, but failed to list any amount "due from affiliates" in the asset column that would show the amount Monaker had funded to RealBiz. *See* Monaker Form 10-Q (January 19, 2016).  The magnitude of this fraud is clear when one considers the fact that Monaker listed assets of $6.94 million and liabilities of $6.92 million on the same balance sheet in which Monaker failed to disclose the transfers of up to $11.1 million to RealBiz. *Id*.  The secret funding arrangement included amounts that nearly doubled Monaker's total reported assets.

### ii. Materiality of Misrepresentations and Omissions

For an omitted fact or misstatement to be material, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988) (quoting *TSC Industries, Inc.*, 426 U.S. at 449). Defendants challenge the materiality of the alleged omissions and misrepresentations sporadically throughout their motion.  Such challenges, however, are improper at the motion to dismiss stage.  "The materiality of a statement is a mixed question of fact and law that requires 'delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact.'" *Batwin v. Occam Networks, Inc.*, Fed. Sec. L. Rep. P 94776 (C.D. Cal.

5

2008) quoting *TSC Indus., Inc.*, 426 U.S. at 449). "Issues involving mixed questions of law and fact are typically resolved by juries." *Watkins v. City of Montgomery, Ala.*, 775 F.3d 1280, 1288 (11th Cir. 2014). Thus, determining materiality at the motion to dismiss stage is premature. *Brady v. Medtronic, Inc.*, 13-62199-CIV, 2015 WL 11181971, at *7 (S.D. Fla. Mar. 30, 2015).

### C. The Plaintiff Sufficiently Alleged Scienter

To pass a motion to dismiss, a plaintiff must "plead 'with particularity facts giving rise to a strong inference' that the defendants either intended to defraud investors or were severely reckless when they made the allegedly materially false or incomplete statements." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir. 2008). In this context, "[s]evere recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1264 (11th Cir. 2006).

"The Supreme Court has held that a 'strong inference' of scienter is an inference that is 'cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Philadelphia Fin. Mgmt. of San Francisco, LLC v. DJSP Enterprises, Inc.*, 10-61261-CIV, 2011 WL 4591541, at *12 (S.D. Fla. Sept. 30, 2011) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007)). Thus, the Court's determination will turn on whether a reasonable person would infer that there was at least a 50-50 chance that the individual defendants knew about the alleged fraud (or were severely reckless in not knowing about it) based on its nature, duration, or amount. *Mizzaro*, 554 F.3d at 1249; *see also In re 21st Century Holding Co. Sec. Litig.*, 2008 WL 5749572 at *7-8 (S.D. Fla. Nov. 7, 2008)

Despite the copious and interwoven allegations in the complaint the Defendants attempt to view each allegation in a vacuum. But that is inappropriate. "In deciding whether a securities-fraud complaint satisfies this test, the court must consider 'whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'" *Philadelphia Fin. Mgmt. of San Francisco, LLC*, 10-61261-CIV, 2011 WL 4591541, at *12 (quoting *Tellabs, Inc.*, 551 U.S. at 323). That is because the Court is not to "scrutinize each allegation in isolation but to assess all the allegations holistically." *Tellabs, Inc.,* 551 U.S. 308 127 S.Ct. 2499, 2511 (2007); *see also Phillips v.*

*Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1017 (11th Cir. 2004) ("We readily join the courts that have interpreted the PSLRA to permit the aggregation of facts to infer scienter"). Here, there are several circumstantial factors that, when viewed together, illustrate that McLeod sufficiently alleged scienter.

Several courts have found that "[w]here a defendant publishes a statement at a time he is in possession of or has access to facts suggesting that the statement is inaccurate, misleading[], or incomplete—as is alleged here—a classic fact pattern giving rise to a strong inference of scienter appears." *In re Sensormatic Elecs. Corp. Sec. Litig.*, No. 018346CIV, 2002 WL 1352427, at *6 (S.D. Fla. June 10, 2002); *see also Fla. Bd. of Adm'rs v. Green Tree Fin. Corp.*, 270 F.3d 645, 665 (8th Cir. 2001) (same); *City of Philadelphia v. Fleming Cos.*, 264 F.3d 1245, 1260–61 (10th Cir. 2001) (in case of omissions, scienter proved by knowledge of omitted fact plus knowledge that omission likely to mislead); *In re Netbank, Inc. Sec. Litig.*, CIV.A.1:07-CV-2298-B, 2009 WL 2432359, at *12 (N.D. Ga. Jan. 29, 2009) ("In the securities fraud context, severe recklessness can be established by allegations that the defendants had knowledge of facts or access to information contradicting their public statements.") (internal citation omitted).

Here, it is undeniable that the 10-K and 10-Q statements issued by Monaker (and signed by Kerby) were false. The 10-K filing issued in June 2015 and the 10-Q filings issued in February 2015 and June 2015 each showed that Monaker owed money to RealBiz. (Dkt. 58 at ¶¶ 51-53). In reality, RealBiz owed Monaker up to $11.1 million as a result of the fact that Monaker had knowingly been injecting large amounts of money into RealBiz unbeknownst to Monaker's investors. (Dkt. 58 at ¶¶ 89, 95). Monaker admitted as much in June 2016, when it made clear in its 10-K filing that $11.1 million in funds had been transferred to RealBiz. (Dkt. 58 ¶ 93). In light of those prior misstatements, Monaker—using a new auditor—issued restatements with respect to its prior erroneous financial statements. (*Id.*).

The D&O Defendants knew that Monaker's financial statements were not alerting its investors to the fact that their investments were being used to support RealBiz. (Dkt. 58 ¶ 72). In direct contradiction to the Monaker financial statements, Mr. Friedman (Monaker's CFO) stated under oath that when RealBiz needed money, he would transfer money from Monaker to RealBiz. (Dkt. 58 ¶ 71e). Mr. Kerby stated under oath that he knew Mr. Friedman had decided to treat Monaker and RealBiz as one company and that he would move money between the companies. (Dkt. 58 ¶ 70i). Mr. Kerby knew of that decision and did not object to it. (Dkt. 58 ¶

70i, m). Mr. Kerby further stated that Monaker did not account for intercompany transactions because it was presumed that what was beneficial for one company was beneficial for both. (Dkt. 58 ¶ 63). Mr. Kerby also signed off on Monaker's financial filings, representing that the statements made therein were accurate and that disclosure controls and procedures had been implemented. (Dkt. 58 ¶¶ 55-60). Mr. Kerby admitted under oath that there was a time period when investors were receiving materially inaccurate financial information when they invested with Monaker, and Monaker believes that its prior financial statements were misstated. (Dkt. 58 ¶ 70 c-d).

Scienter is bolstered by the high-level positions that the D&O Defendants held in both Monaker and RealBiz. As the Eleventh Circuit has stated, a defendant's high-level position can support a finding of scienter, as long as a senior official had oversight regarding financial statements that included misrepresentations or omissions. *Brophy v. Jiangbo Pharm., Inc.*, 781 F.3d 1296, 1304 (11th Cir. 2015) (citing cases). Here, during the class period, Mr. Kerby has been the chairman and Chief Executive Officer of Monaker since 2008 and also served as Chief Executive Officer of RealBiz. (Dkt. 58 ¶¶ 18, 40). Mr. Monaco has been on Monaker's board of directors since 2011 and was named chairman of the board in 2015. (Dkt. 58 ¶ 20). Mr. Monaco was also a member of the RealBiz board of directors. (Dkt. 58 ¶ 40). Based on their positions, the D&O Defendants controlled both balance sheets and were in complete control of Monaker's financial reporting. (Dkt. 58 ¶ 38). Indeed, Mr. Kerby affirmatively attested to the accuracy of each of the financial statements issued by Monaker under Sarbanes-Oxley. (Dkt. 58 ¶ 55-60).

Additionally, courts have held that where misstatements or omissions concern a company's core operation, scienter may be imputed to top officers. *Schultz v. Applica Inc.*, 488 F. Supp. 2d 1219, 1226 n.3 (S.D. Fla. 2007); *In re Netbank, Inc. Sec. Litig.*, No. CIV.A.1:07-CV-2298, 2009 WL 2432359, at *5 (N.D. Ga. Jan. 29, 2009) (sustaining securities complaint where misstatements occurred in company's core business); *In re Winstar Communications*, No. 01 CV 3014, 2006 WL 473885, *7 (S.D.N.Y. Feb. 27, 2006) ("Where accounting irregularities relate to accounting practices that are sufficiently critical to the core operations of the company, knowledge of the accounting improprieties may be imputed to the company's officers and directors who are involved in day-to-day operation of the company.") (citation omitted). *Cf. In re Sportsline.com Sec. Litig.*, 366 F. Supp. 2d 1159, 1170 (S.D. Fla. 2004) (where allegations did not concern core business, scienter not plead sufficiently).

Moreover, the incredible discrepancy between what was originally reported in Monaker's financial statements and the true state of underlying facts (as shown in Monaker's restatements) further supports a strong inference of scienter. "A number of decisions cite the magnitude of the fraud in weighing an alleged inference of scienter." *In re Eagle Bldg. Techs., Inc., Sec. Litig.*, 319 F. Supp. 2d 1318, 1326 (S.D. Fla. 2004) (citing cases). While the magnitude of the fraud is not enough to satisfy the scienter requirements alone, it is an important consideration. *In re Paincare Holdings Sec. Litig.*, 6:06-CV-362-ORL-28DA, 2007 WL 1229703, at *7 (M.D. Fla. Apr. 25, 2007).

The original 10-K and 10-Qs filed by Monaker illustrated that *Monaker owed RealBiz* $974,889 in February 2015, $1,286,421 in June 2015, and $1,286,421 in January 2106. (Dkt. 58 ¶¶ 51-53). In reality, Monaker had been funding RealBiz for an extended period of time to the tune of approximately $11.1 million and *RealBiz actually owed Monaker* an incredible amount of money. *Id.* This drastic shift made clear that Monaker had been diverting funds to RealBiz without any notice to its investors that it was not using the funds for the purposes it disclosed. (Dkt. 58 ¶ 68). To understand the magnitude of the fraud, it is important to note that Monaker's 10-K filed with the SEC on February 28, 2015 showed that Monaker's total assets were $7.09M. (Form 10-K, filed 2-28-2015). In other words, Monaker transferred more money to RealBiz than it held in assets in February 2015. The Defendants' argument that these claims are tantamount to mismanagement, and not fraud, is patently absurd.

Finally, it is important to note that the D&O Defendants each had a vested financial interest in ensuring that the stock prices in both entities (Monaker and RealBiz) remained inflated. Indeed, each of the D&O Defendants were significant shareholders in each company. (Dkt. 58 at ¶¶ 18, 20-21, 97; Dkt. 31-5 at 14). The D&O Defendants did not disclose Monaker's funding to RealBiz until their ownership interest in RealBiz was drastically reduced. (Dkt. 58 at ¶21). The Supreme Court has stated that "motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference." *Tellabs, Inc.*, 551 U.S. at 310. While it is true that motive alone is not enough to infer scienter, in tandem with all the factual allegations above, the financial motive inherent in holding stock in both Monaker and RealBiz fully supports a scienter inference. *See City Pension Fund for Firefighters and Police Officers in City of Miami Beach v. Aracruz Cellulose S.A.*, 2011 WL 12502370 at *17 (S.D. Fla. Sept. 16, 2011) ("Allegations of motive and opportunity may be relevant to a showing of severe

recklessness but are insufficient standing alone to prove scienter."); *In re PSS World Medical, Inc.*, 250 F. Supp. 2d 1335, 1350-51 (M.D. Fla. 2002) (same).

The Defendants' contention that the restatement illustrates an improvement for Monaker's financial health is misleading. (Dkt. 67 at 11). Yes, Monaker's restatement shows that RealBiz owes money to Monaker, but it is uncollectible. The D&O Defendants attempted to negotiate a deal in which Monaker would agree to receive $0 in exchange for the $11 M that Monaker had provided to RealBiz as long as RealBiz agreed to forego collecting the $1.3 M due from Monaker to RealBiz. (Dkt. 1 ¶ 67). Such a prospective deal convincingly shows the new account receivable is not collectible, as that "deal" would consummate the fraud with a paper transaction that would retire a debt at roughly 10 cents on the dollar. In reality, RealBiz' latest 10-K reflects less than $150,000 in the bank, Monaker reflects its investment value in RealBiz to be $0 and doesn't list any receivable owed from RealBiz on its balance sheet. Monaker's latest 10-Q shows that, when settling what it calls the "Breakup Litigation," Monaker paid RealBiz $100,000 and issued 20,000 shares of stock to persons designated by RealBiz. (Form 10-Q, note 10, filed 1-18-2018). In conjunction therewith, Defendant Monaco loaned RealBiz an additional $530,000 on January 26, 2018. (RealBiz 8-K, filed 2-12-2018). The Defendants are blatantly misleading the Court when they attempt to argue that the secret funding of RealBiz's operations somehow created a benefit to Monaker that could be recouped.[1] Monaker's own SEC filings show that Monaker never collected a penny of these funds back from RealBiz; in fact, Monaker paid an additional $100,000 to RealBiz, and Defendant Monaco loaned $530,000 to RealBiz, when settling the "Breakup Litigation." Taken together, these facts show that the Defendants either intended to defraud Monaker's investors or were severely reckless when they issued the financial documents at issue.

### D. The Plaintiff Sufficiently Alleged Reliance

Reliance "is an essential element of the § 10(b) private cause of action" because "proof of reliance ensures that there is a proper connection between a defendant's misrepresentation and a plaintiff's injury." *Halliburton,* 131 S.Ct., at 2184 (internal quotation marks omitted). "The

---

[1] Monaker argues that its understatement of an account receivable owed by RealBiz "would put Monaker in a better position than the amount reported." DE 67 at pg. 7. Monaker's use of the word "understatement" is also misleading since Monaker, in fact, failed to state any amount at all owed by RealBiz.

traditional (and most direct) way" to demonstrate reliance "is by showing that [the plaintiff] was aware of a company's statement and engaged in a relevant transaction . . . based on that specific misrepresentation." *Id.*

Requiring proof of direct reliance in all 10(b) litigation, however, "would place an unnecessarily unrealistic evidentiary burden on [a] plaintiff who has traded on an impersonal market." *Basic Inc. v. Levinson*, 485 U.S. 224, 245 (1988). Accordingly, the Supreme Court "endorsed the 'fraud-on-the-market' theory, which permits certain Rule 10b–5 plaintiffs to invoke a rebuttable presumption of reliance on material misrepresentations aired to the general public." *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1192 (2013).

"[A] plaintiff must make the following showings to demonstrate that the presumption of reliance applies in a given case: (1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *Halliburton*, 134 S. Ct. at 2408. Here, the Defendants take issue with the Plaintiffs' allegations regarding whether the security was traded on an efficient market. (Dkt. 67 at 14-16).

As an initial point, the heightened pleading requirements of Rule 9(b) and the PSLRA are inapplicable to the reliance prong of a Rule 10b-5 claim. *Mill Bridge V, Inc. v. Benton*, 2009 WL 4639641 at *32 (E.D. Pa. Dec. 3, 2009). Accordingly, the reliance element is subject to only the notice-pleading standards of Rule 8. *Id.*; *see also USA Talks.com*, 2000 WL 1887516 at *6; *Damian v. Montgomery County Bankshares*, 981 F.Supp. 2d 1368, 1383 n. 10 (N.D. Ga. 2013).

The complaint alleges that Monaker stock was traded on an efficient market and that Monaker securities were liquid and traded with regularity. (Dkt. 58 at ¶¶ 32, 123). Specifically, Monaker stock was traded in a public over the counter market. (Dkt. 31-4 at 5). At the motion to dismiss stage, those allegations are sufficient to invoke the presumption of reliance.

Even beyond the lenient pleading standard, though, the Defendants' argument fails for a more fundamental reason: the Defendants' argument raises fact questions that are not appropriately decided on a motion to dismiss. *See In re USA Talks.com Sec. Litig.*, 2000 WL 1887516 at *6 (S.D. Cal. Sept. 14, 2000) ("A showing of whether the [efficient market elements] are met requires a factual exploration which is premature at the motion to dismiss stage."). It is well established that market efficiency such as to trigger the fraud-on-the-market presumption is not a pure question of law and should be decided based on an evidentiary record. *See In re*

*Heckmann Corp. Sec. Litig.*, Fed. Sec. L. Rep. P 97521 (D. Del. 2013) (market efficiency typically involves resolving disputes among conflicting expert opinions); *In re UBS Auction Rate Sec. Litig.*, 2010 WL 2541166 at *25 (S.D.N.Y. June 10, 2010); *Batwin v. Occam Network, Inc.*, 2008 WL 2676364 at *15 (C.D. Cal. July 1, 2008).

The impropriety of ruling on whether a market is "efficient" at the motion to dismiss phase becomes even more pronounced in light of the fact that the Eleventh Circuit has not provided any required indicia of what makes a market "efficient." In fact, the Eleventh Circuit has not adopted *any* sort of mandatory analytical framework for determining whether a particular stock trades in an efficient market. *See Local 703 I.B. of T. Grocery & Food Employees' Welfare Fund v. Regions Financial Corp.*, 762 F.3d 1248, 1244 (11th Cir. 2014) ("By not setting forth a mandatory framework, we have given District Courts the flexibility to make the fact-intensive inquiry on a case-by-case basis.") Thus, district courts may rely on *any* relevant *evidence* to determine whether a market is efficient. Without an evidentiary record, there is no way for the Court to rule on the "fact-intensive" question of whether Monaker traded on such a market. *Id.*

The importance of weighing the evidence on whether an OTC market is "efficient" is buttressed by the fact that this Court—on motion for class certification—has rejected the argument now raised by the Defendants' that the OTC market is per se inefficient. In fact, this Court previously concluded that an OTC market may indeed be 'efficient' for purposes of invoking the fraud on the market theory. *In re Amerifirst Sec. Litig.*, 139 F.R.D. 423, 430-31 (S.D. Fla. 1991) ("[T]his Court notes that the majority of courts considering the issue have held that the fact that securities traded on an OTC market, rather than on a national stock exchange, will not necessarily defeat a finding of market efficiency provided there is evidence that the stock at issue traded in an environment where material information concerning the company is widely available and accurately reflected in the price of the stock.") (collecting cases).[2]

Numerous other courts have also found—on motions for class certification—that the OTC is an efficient market. *See, e.g.*, *In re Enron Corp. Sec.*, 529 F. Supp. 2d 644, 772 (S.D. Tex. 2006) (finding over-the-counter market efficient at the class certification stage); *Hoexter v. Simmons*, 140 F.R.D. 416, 419 (D. Ariz. 1991) (same).

---

[2] The fact that the Defendants attempt to cite to a Yahoo webpage (which is entirely inappropriate) illustrates precisely why the market efficiency analysis is so fact intensive.

The sole case from this circuit relied on by the Defendants—*In re Sahlen & Associates, Inc. Sec. Litig.*, 773 F. Supp. 342, 357 (S.D. Fla. 1991)—is inapposite.  In that case, the district court dismissed a plaintiff's security action because that plaintiff made *no* allegations of "market efficiency or any other characteristic about the market in which they traded." *Id.* at 357.  In reaching that conclusion, the court actually set forth a very lenient standard—"a plaintiff seeking to invoke the fraud on the market theory must allege either that the stock they purchased or sold was actively traded on a well-developed, efficient market or facts which give rise to such an inference"—but determined that without *any* pertinent allegations, the complaint could be dismissed.  *Id.* at 356.  But that is not the case here.  In stark contrast to *In re Sahlen & Associates,* the allegations set forth by the Plaintiffs—that Monaker stock was traded on a public, efficient, OTC market—are sufficient at the motion to dismiss stage.[3]  Now, Monaker is trading on NASDAQ. (Dkt. 58, ¶ 102).[4]

The Plaintiffs sufficiently alleged reliance to survive the current motion to dismiss.  Alternatively, whether the OTC market in which Monaker stock is traded is actually efficient, will be a "fact-intensive inquiry" for which the parties will produce evidence.  *Local 703 I.B. of T. Grocery & Food Employees' Welfare Fund*, 762 F.3d at 1244.  Until such evidence is appropriately before the Court, it is premature to address this issue.

### E.  The Plaintiff Sufficiently Alleged Loss Causation

Defendants misconstrue the Amended Complaint in an attempt to muddy what has been plainly alleged by Plaintiffs regarding loss causation: that on June 23, 2016, in explaining the need to restate its previous financial statements, Defendants disclosed in substance and detail to Monaker investors *for the first time* that it was owed millions of dollars by RealBiz and thereby caused a drop of Monaker's stock price. (Dkt. 58 at ¶¶ 3, 99) ("Monaker disclosed on June 23, 2016 that its previous financial statements would need to be restated as a result of the unreported and historic financial support provided by Monaker to RealBiz, Monaker's share price drastically declined'"); (Dkt. 58 at e.g. ¶¶ 89-96, 98-108). Defendants point to the Form 8-K's filed on June

---

[3] The out-of-circuit cases cited by Defendants are equally inapplicable.  With the exception of *Salvani v. ADVFN PLC*, 50 F. Supp. 3d 459, 472 (S.D.N.Y. 2014), each of the cases were decided at the class certification stage.  And *Salvani,* just like I*n re Sahlen & Associates*, involved a situation where the plaintiff did not even plead the existence of an efficient market.

[4]     https://www.nasdaq.com/press-release/monaker-group-to-begin-trading-on-nasdaq-capital-market-20180222-00764

17, 2016 and March 14, 2016 in their response, and would have this Court believe that the statements identified and highlighted by Plaintiffs merely transmitted to investors that Defendants had hired a new auditor (March 14th 8-K) or that Monaker's previous financial statements could not be relied upon and would need to be restated (June 17th 8-K). (Dkt. 67 at 10). Yet, in spite of Defendants' convenient construction of the Amended Complaint, Defendants cannot deny that the disclosure of the millions of dollars owed to Monaker on June 23, 2016 – amounts that *exceeded* Monaker's total assets at the time - was wholly absent from either Monaker's June 17, 2016 or March 14, 2016 Form 8-Ks.[5] The mere disclosure on March 14, 2016 that Monaker hired a new auditor is meaningless to the claims in the lawsuit.  It was not until the June 23, 2016 10-K that the investors were first put on notice that Monaker's prior financial statements included an omission potentially exceeding $11 million dollars, and an amount that greatly exceeded the company's total assets.

Defendants also take issue with the method in which Plaintiffs quantify the stock drop caused by the June 23, 2016 disclosure, offer their own, and highlight a "rebound" that renders the allegations of loss causation deficient. *Id.* at 18-20. Regardless of what specific range of times before and after the June 23, 2016 disclosure Defendants choose[6], Defendants simply cannot escape what Plaintiffs have alleged in detail – and the objective truth – that Monaker's stock dropped immediately after the June 23, 2016 disclosure, continued to drop for weeks afterwards, and despite some slight rebounds in price, Monaker's stock value *to date* has yet to recover to pre-disclosure levels. AC at e.g. ¶¶ 3, 99.

While there is no bright line rule as to what specific times, price points, or range should be used to calculate stock drop for the purposes of pleading loss causation, the method employed by Plaintiffs in the Amended Complaint – choosing a stock price the day before and the day after a disclosure – is not only an approach well within the norm in this district (and others), but a

---

[5] In fact, the June 17, 2016 Form 10-Q explicitly states that it plans to disclose the details of the amounts owed in its June 23, 2016 Form 10-K "which [Monaker] plans to file shortly after the date of this report."

[6] It is incredible that Defendants accuse Plaintiffs of "cherry picking" stock prices in calculating loss causation when Defendants themselves choose a time period where the markets were closed – i.e. the closing price of Monaker Stock on June 23, 2016 and the opening price on June 24, 2016 – to support their conclusion that there was "hardly a calamitous slide" in stock price after the June 23, 2016 disclosure.

conservative one, as well. *See Broadway Gate Master Fund, Ltd. v. Ocwen Financial Corporation*, 2016 WL 9413421 at *6 (S.D. Fla. 2016) (holding that Plaintiffs who calculated stock drop by using a stock price of the day prior to a disclosure and a stock price *three days after* adequately pled loss causation) (emphasis added); *See Richard Thorpe & Darrel Weisheit v. Walter Investment Management, Corp.*, 111 F. Supp. 3d 1336, 1381 (S.D. Fla. 2015) (holding that Plaintiffs who calculated stock drop by using the opening and closing stock prices of the date of the disclosure adequately pled loss causation); *See Durgin v. Mon*, 659 F. Supp. 2d 1240, 1256-1257 (S.D. Fla. 2009) (holding that Plaintiff who calculated stock drop by using a stock price the day of the disclosure and a stock price the day after adequately pled loss causation).

Moreover, the "rebound arguments" submitted to this Court by Defendants are improper at this stage and do not negate any inference of loss causation. In *Broadway Gate Master Fund, Ltd.* the Southern District of Florida held that plaintiffs adequately alleged loss causation to withstand dismissal and explicitly rejected Defendants' rebound arguments. *Broadway Gate Master Fund, Ltd.*, 2016 WL 9413421 at *6 (S.D. Fla. 2016). There, Defendants argued that although stock values dropped from a close of $26.34 per share on August 11, 2014 to a close at $25.16 per share on August 12, 2014, the stock price recovered and closed three days later at $26.92. *Id.* In finding for plaintiffs, the Southern District agreed with the Second Circuit Court of Appeals in *Acticon AG v. China N.E. Petroleum Holdings Ltd.*, 692 F. 3d 34 (2d Cir. 2012) holding that "a rebound in stock price did not negate the inference of economic loss at the pleading stage" and that "[a]t this stage in litigation, we do not know whether the price rebounds represent the market's reactions to the disclosure of the alleged fraud or whether they represented unrelated gains". *Id.* (quoting *Acticon AG v. China N.E. Petroleum Holdings Ltd.*, 692 F. 3d 34, 41 (2d Cir. 2012)). The Second Circuit's explanation as to why rebound arguments are fundamentally flawed is instructive:

> This analysis takes two snapshots of the plaintiff's economic situation and equates them without taking into account anything that happened in between; it assumes that if there are any intervening losses, they can be offset by intervening gains. But it is improper to offset gains that the plaintiff recovers after the fraud becomes known against losses caused by the revelation of the fraud if the stock recovers value for completely unrelated reasons. Such a holding would place the plaintiff in a worse position than he would have been absent the fraud.

*Acticon AG v. China N.E. Petroleum Holdings Ltd.*, 692 F. 3d at 41.

Thus, in the amended complaint, Plaintiffs properly allege an 11% drop of the stock price caused by the disclosure in the June 23, 2016 Form 10-K by calculating the change between the June 22, 2016 opening stock price of $2.90 and the June 24, 2016 opening stock price of $2.60.[7] Although Defendants baselessly take issue with the use of the stock price of June 22, 2016 because it is a "full trading day before," calculating the change between the January 23, 2016 opening stock price of $2.81 and the June 24, 2016 closing stock price of $2.50, reveals that whichever way Defendants attempt to cut it, Monaker stock dropped by 11% *within a mere day* of the June 23, 2016 disclosure. This amount *is more than sufficient* to sustain Plaintiffs' burden at this stage. *Richard Thorpe & Darrel Weisheit v. Walter Investment Management Corp.*, 111 F. Supp. 3d 1336, 1381 -1382 (S.D. Fla. 2015) (holding that an allegation of an 11% drop in share value the same day as a corrective disclosure supports a finding of loss causation); *Broadway Gate Master Fund, Ltd.*, 2016 WL at *6 (holding that Plaintiffs alleging a 4.47% drop in stock price sufficiently plead loss causation). Even approaching the calculation as conservatively as *logically* possible by calculating the price change between the *most immediate* price points surrounding the filing of the Form 10-K – i.e., the June 23, 2016 opening and closing stock prices of $2.81 and 2.65, respectively – Monaker's stock dropped by 5.69%, an amount still sufficient to plead loss causation. *Broadway Gate Master Fund, Ltd.*, 2016 WL at *6 (holding that Plaintiffs alleging a 4.47% drop in stock price sufficiently plead loss causation). Utilizing wider ranges of time to calculate stock drop, as alleged, or simply taking notice of the declining stock price of Monaker subsequent to the June 23, 2016 disclosure is not only proper, but puts to rest any remaining doubt that loss causation occurred and that Plaintiffs have met their burden by highlighting same. (Dkt. 58 e.g. at ¶ 99) (alleging that by July 7, 2017, Monaker's stock traded at $2.00 per share, a 31% drop[8] from the pre-disclosure price of $2.90). Ultimately, while Monaker stock nearly rebounded to pre-disclosure values almost two months later on August 16, 2016, the stock thereafter continued to decline and has never consistently recovered since the June 23, 2016 financial restatement disclosure. *Id.* at ¶ 101. In fact, Monaker stock price is now trading at

---

[7] According to EDGAR, the June 23, 2016 Form 10-K filing was accepted that same day at approximately 1:14 P.M. Eastern Standard Time.

[8] Monaker stock dropped by 28.82% if the pre-disclosure stock price of $2.81 is used, instead.

an all-time low of around 95 cents, a 66% drop, at minimum, from pre-disclosure levels when one factors in the 2.5 stock split that was performed earlier this year and referenced in the Amended Complaint. *Id.* at ¶ 102. Defendants simply cannot deny what Plaintiffs have now more clearly alleged in the Amended Complaint: Monaker's stock dropped after the corrective disclosure and has yet to recover. Plaintiffs have met their burden at this stage, and Defendants' motion to dismiss should be denied. *Broadway Gate Master Fund, Ltd.*, 2016 WL at *6; *Richard Thorpe & Darrel Weisheit*, 111 F. Supp. 3d at 1381 -1382.

## III.   PLAINTIFF PLED A CAUSE OF ACTION UNDER 15 U.S.C. § 77o OF THE SECURITIES ACT

The Court previously determined that this count of the initial complaint was properly pled. (Dkt. 53 at 8). The Court dismissed Count I, instead, for the "sake of efficiency." *Id.* Thus, the facts alleged in the amended complaint, having remained for the most part substantively unchanged as they relate to Count I, are sufficient to state a claim under 15 U.S.C. § 77o.[9]

Although Plaintiffs have already met the applicable pleading standards, Defendants raise a new argument in their second motion to dismiss Count I – *i.e.*, that § 15 is "simply not available to purchasers in a private placement". (Dkt. 67 at 5). This is patently false and a convenient oversimplification of the law. In *APA Excelsior III, L.P. v. Premiere Technologies, Inc.*, 2004 WL 6064402 (11th Cir. 2004), for example, the 11th Circuit held that such Plaintiffs *do* have standing to maintain a claim under §§ 11 and 15. *Id.* at *2-5 (holding that a Plaintiff has standing under § 15 regardless if a registration statement was not required as to them and finding that the "SEC and courts have…applied what is referred to as the integration analysis when a private offering is followed by a public offering, or vice versa."). Similarly, it is also false – as Defendants now argue – that Plaintiffs are required to allege that a registration statement or prospectus existed *during* the Class Period. (Dkt. 67 at 5). Rather, as stated in Plaintiffs' previous response on this issue (Dkt. 40 at 19-20), all that is required at this stage is that Plaintiffs have adequately alleged that Defendants Kerby and Monaco themselves could have been responsible for violations of §§ 11 or 12 based on the complaint. *Marrari v. Medical Staffing Network Holdings, Inc.*, 395 F. Supp. 1169, 1181 (S.D. Fla. 2005) ("While some, or all, of the Individual

---

[9] In light of the Court's previous determination as to the sufficiency of Plaintiffs' allegations with respect to Count I (Dkt. 53 at 8), Plaintiffs hereby incorporate by reference the part of its response to Defendants' Monaker, Kerby, and Monaco's first motion to dismiss as it relates to the issue. (Dkt. 40 at 20-21).

Defendants might ultimately demonstrate that they lacked the requisite power or control over MSN to be considers [sic] controlling persons pursuant to Section 15, such a factual inquiry would be inappropriate at this time.). Plaintiffs have done so, (Dkt. 58 e.g. at ¶¶ 110-116) and thus, as this Court has already determined, Plaintiffs have stated a claim under 15 U.S.C. § 77o. (Dkt. 53 at 8); *Marrari*, 395 F. Supp. at 1181; *In re AFC Enterprises, Inc. Securities Litigaton*, 348 F. Supp. 2d 1363, 1381 (N.D. Fla. 2004) ("Here, the Plaintiffs have adequately alleged controlling person liability against the Director Defendants...Plaintiffs alleged that these Defendants, directors of AFC with extensive participation in day-to-day affairs, possessed the power to control AFC's general operations… also alleged that the Director Defendants, given the responsibility to sign AFC's SEC filings, including prospectuses and registration statements, had control over the specific offending statements.").

## IV.     PLAINTIFFS CANNOT NOTIFY CLASS MEMBERS OF THE LITIGATION OR APPOINT A LEAD PLAINTIFF WHILE A STAY IS IN PLACE AND NON-COMPLIANCE WITH THESE PLSRA PROVISIONS IS NOT GROUNDS FOR DISMISSAL OF CLASS ACTION ALLEGATIONS

At Section V of their Motion to Dismiss, Defendants claim for the first time[10] that "at a minimum, all class action allegations should be dismissed" because Plaintiffs have not complied with 15 U.S.C. § 78u(a)(3)(A)(i)'s "strict" requirements by failing to (i) publish a notice to the putative plaintiff class within 20 days of filing the amended Complaint and (ii) move for lead plaintiff status within 60 days after that notice is published. (Dkt. 67 at 21).

First, the Defendants have cited the wrong statute underpinning this argument. 15 U.S.C. § 78u(a)(3)(A)(i) relates to the authority and discretion of the U.S. Securities and Exchange Commission to conduct investigations, not to private securities litigation.

Second, to the extent that Defendants may have intended to base their argument on 15 U.S.C. § 78u-4(a)(3)(A)(i), which relates to early notice to potential class members and the appointment of a lead plaintiff in securities class actions, Defendants' new argument does not warrant dismissal. Case law is clear that non-compliance with 15 U.S.C. § 78u-4(a)(3)(A)(i) is

---

[10] While Defendants note that this case has been open for more than 15 months, none of the Defendants raised this issue in *any* of their previous motions to dismiss, *see* (Dkt. 30); Dkt. 31, and it was notably absent from the parties' Joint Scheduling Conference Report. (Dkt. 26).

*not* grounds for dismissal, which contravenes the very purpose of the PSLRA. As stated in *Griffin v. PainWebber Inc.*, 84 F. Supp. 2d 508, 514 (S.D. NY 2000):

> Plaintiff does not dispute that he has failed to comply with this provision. However, the PSLRA is silent regarding the effect of a failure to comply. Defendants seek dismissal of the action, but such a remedy would not serve the purpose for which the early notice provision was enacted, which was "'to enable investors to intervene in the litigation and take charge of it by, among other things, selecting the lawyers to represent the class and setting the terms of their compensation.'"

*Id*. (citing *Ravens v. Iftikar*, 174 F.R.D. 651, 653 (N.D. Cal. 1997)); *see also Burke v. Ruttenberg*, 102 F. Supp. 2d 1280, 1318 (N.D. Ala. 2000) ("The Court need not go so far as to dismiss the class claims or lead plaintiff motions in the instant action because of the publication of defective notice.") (citing *In re Network Assocs., Inc., Sec. Litig.*, 76 F. Supp. 2d 1017, 1032 (N.D. Cal. 1999)); *Holly v. Kitty Hawk, Inc.*, 200 F.R.D. 275, 279 (N.D. Texas 2001) (same).

Further, in *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484 (S.D. Fla. 2003), this Court found that there was no basis to deny a motion for class certification on the same grounds. *Id.* at 503 ("[T]he Defendants have not provided, nor has this Court located, any cases which hold a class may not be certified where Plaintiffs did not inform individuals of the entire proposed class period in early PSLRA notices."). Instead, district courts seeking to remedy noncompliance with 15 U.S.C. § 78u-4(a)(3)(A)(i) simply order class plaintiffs to publish the notice within a time certain. *Mastrella v. WCI Communities, Inc.*, 2008 WL 11331712 at *3 (S.D. Fla. 2008) (ordering plaintiffs to publish a notice consistent with the PLSRA); *Burke*, 102 F. Supp. at 1318 (appointing a temporary lead plaintiff and ordering plaintiffs to publish a compliant notice); *Holly*, 200 F.R.D. at 279 (same); *Griffin*, 84 F. Supp. 2d at 514 (same).

Plaintiffs will be able to best satisfy the substantive requirements of the PLSRA governing notice and the appointment of a lead plaintiff once the amended complaint survives the motion to dismiss and the current stay (the second in the case) is lifted. Such a course of action will best serve both potential class members and named Plaintiffs by ensuring that adequate notice is published on the first attempt and minimizing the risk that Plaintiffs will unnecessarily expend resources on multiple publications. These aims fulfill the very purpose of 15 U.S.C. § 78u-4(a)(3)(A)(i) – to inform accurately and efficiently potential members as to the substance of the pleadings and the identity of the named plaintiffs and their qualifications.

Technical deviations are of no consequence, particularly when the complaint and underlying litigation has changed over time. *Burke*, 102 F. Supp. 2d at 1310-1311 ("For an investor to make an intelligent determination of whether he, she, or it will move a court to be appointed lead plaintiff, that investor must have all relevant information that would inform such a choice."); *Burke*, 102 F. Supp. 2d at 1312 (interpreting the notice requirements to be satisfied when notice "gives members of the putative class sufficient information from which to make basic decisions about deciding whether to act as lead plaintiff while not requiring the named plaintiff, who may not be chosen lead plaintiff, to expend too many of his, her or its resources in publishing").

## V.   IN THE ALTERNATIVE, PLAINTIFF SHOULD BE GRANTED LEAVE TO AMEND

If the Court grants the motion to dismiss, in whole or in part, on any basis, the Court should grant leave to amend. *Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001) (reversing district court's dismissal with prejudice and emphasizing that plaintiffs had never been provided notice of the possible deficiencies in their complaint and observing that "a district court's discretion to dismiss a complaint without leave to amend 'is severely restrict[ed] by Rule 15(a)"). The Plaintiffs, with knowledge of the alleged deficiencies in their Amended Complaint (the majority of which revolve around whether Plaintiff satisfied the heightened pleading standards of Rule 9(b) and the PSLRA), will be able to remedy any remaining pleading deficiencies based upon the factual material available (much of which was not included in the Amended Complaint).

## CONCLUSION

The Complaint should not be dismissed with or without prejudice, and the Defendants' motion should be denied.

Respectfully submitted,


/s/ John G. Crabtree
John G. Crabtree

John G. Crabtree
Florida Bar No. 886270
Charles M. Auslander
Florida Bar No. 349747
Brian C. Tackenberg
Florida Bar No. 0107224
Crabtree & Auslander
240 Crandon Boulevard, Suite 101
Key Biscayne, Florida 33149
Telephone (305) 361-3770
jcrabtree@crabtreelaw.com
causlander@crabtreelaw.com
gbaise@crabtreelaw.com
btackenberg@crabtreelaw.com
floridaservice@crabtreelaw.com

*Counsel for the Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 26, 2018, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record identified below via transmission of Notices of Electronic Filing generated by CM/ECF or as otherwise specified below.

*/s/ John G. Crabtree*
John G. Crabtree

## SERVICE LIST

Philip E. Ward
Florida Bar No. 869600
Jon K. Stage
Florida Bar No. 779430
HODKIN STAGE WARD, PLLC
54 S.W. Boca Raton Blvd.
Boca Raton, Florida 33432
Telephone: (561) 810-1600
Facsimile: (561) 300-2128
pward@hswlawgroup.com
jstage@hswlawgroup.com
*Attorney for Defendant, D'Arelli Pruzansky,*
*P.A.*

John E. Clabby
Florida Bar No. 113664
Erin J. Hoyle
Florida Bar No. 117762
CARLTON FIELDS JORDEN BURT, P.A.
4221 W. Boy Scout Blvd., Ste. 1000
Tampa, FL 33607
Phone: (813) 223-7000
Fax: (813) 229-4133
jclabby@carltonfields.com
ehoyle@carltonfields.com

Jose A. Loredo
Florida Bar No. 603058
CARLTON FIELDS JORDEN BURT, P.A.
P.O. Box 019101
Miami, Florida 33101-9101
Telephone: 305.530.0050
Facsimile: 305.530.0055
jloredo@carltonfields.com
*Attorneys for Defendants Monaker Group, Inc.,*
*William Kerby, and Don Monaco*